Warren Sand & Gravel Co., Inc., Oil City Sand & Gravel Co., Inc. and Davison Sand & Gravel Company, Appellants, *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Appellee.

Commonwealth of Pennsylvania, Department of Environmental Resources, Appellant, *v.* Warren Sand & Gravel Co., Inc., Oil City Sand & Gravel Co., Inc. and Davison Sand & Gravel Company, Appellees.

Argued March 5, 1975, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Edward Friedman* and *Robert J. Trace*, for corporate appellants-appellees.

*John P. Krill, Jr.,* Assistant Attorney General, for Commonwealth, appellant-appellee.

OPINION BY JUDGE KRAMER, July 9, 1975:

This case involves cross appeals filed by the Department of Environmental Resources (DER), on the one side, and, on the other side, Warren Sand and Gravel

Co., Inc. (Warren), Oil City Sand & Gravel Co., Inc. (Oil City) and Davison Sand & Gravel Company (Davison),[1] from a final order of the Environmental Hearing Board (Board), dated May 3, 1974. A description of that order will be given hereinafter.

This case had its genesis when in October and November of 1971, the Gravel Companies filed applications for permits to remove sand and gravel from the bed of the Allegheny River. During February and March of 1972 DER conducted what it termed "a fact finding hearing," which it deemed to be "not an adjudicative hearing under the Administrative Agency Law" (Act of June 4, 1945, P.L. 1388, *as amended,* 71 P.S. §1710.1 et seq.). At this hearing the Gravel Companies were not permitted to cross-examine, but were given the right to offer and rebut evidence. The Gravel Companies were notified that they would receive written notice of the action taken by DER on the Gravel Companies' applications, and that they would be given a written statement of the basis for DER's action together with a description of appeal procedures. On April 10 and 12, 1972, DER issued permits for dredging operations by the Gravel Companies which apparently consisted of the same permit issued in previous years, but, in addition, added several pages of terms and conditions specifying in considerable detail the manner in which the dredging operations were to be conducted. One effect of these terms and conditions was to limit future dredging to areas previously dredged. On May 1 and 15, 1972 the Gravel Companies filed timely notices of appeal with the Board in which they excepted to three of the terms and conditions of the permits. The terms and conditions excepted to were as follows:

---

1. The three corporate appellants will be referred to collectively as Gravel Companies, unless otherwise restricted to one of the three, in which case, they will be referred to by individual company names.

"I. Dredging shall not take place any closer than fifty (50) feet from the shore line or from islands.

"II. Dredging shall not be permitted in the period between 6:00 p.m. Friday and 7:00 a.m. Monday, nor between 6:00 p.m. on the day preceding a national holiday and 7:00 a.m. on the day following the holiday.

"III. Dredging shall not take place in any natural and untouched areas."

Hearings were held before the Board, after which it issued an adjudication on August 8, 1973, which was deemed by a supplemental order (August 31, 1973) to be interlocutory. In its adjudication, which included extensive findings of fact and conclusions of law, the Board concluded that the first two conditions, quoted above, were arbitrary, unreasonable and not supported by the evidence. The Board decided the third condition was reasonable and supported by the evidence, but the Board remanded the matter to enable DER to consider the economic impact of the timing of such a permit condition. In response to the Board's adjudication, DER notifield the Gravel Companies, on October 18, 1973, that their proposed dredging into natural and untouched areas would be environmentally undesirable and that the economic impact of prohibiting same would be minimal. DER, therefore, denied the Gravel Companies' request for extension of dredging into natural and untouched areas.

In December 1973, further hearings were conducted before the Board relative to DER's October 18, 1973 determination, and on May 3, 1974, the Board issued its final adjudication and order affirming its interlocutory adjudication, but modifying its original adjudication by granting the extension of dredging by the Gravel Companies into specified new areas on a short-term basis. The Board concluded that the risk of severe adverse economic impact from a limitation of dredging to pre-

viously dredged areas justified certain small extensions of dredging which would not interfere with or harm the ecologically important "riffle areas" of the river. On May 23, 1974, the Board denied the Gravel Companies' petition for modification of the May 3, 1974 order. DER and the Gravel Companies then appealed to this Court.

To give some perspective to this matter, we will set forth some historical and statistical facts taken from the record. The river in question is the Allegheny River which is about 200 miles long from the Kinzua Dam running southwardly. In preglacial times, this river flowed northwardly, but as a result of the uplifting of the entire area caused by the advance of glaciers into Western Pennsylvania, the direction was changed. As the glaciers melted, the waters carved into the rock formations of the area, eroding the earth into steep valleys where the rock formations were hard and into wider valleys where soft. The runoff of water carried with it portions of the earth whereby the valleys became choked with alluvium. The glaciation lasted for over a million years and ended about 11,000 years ago. The glacial deposits were carried downstream and through the processes of flooding and hydraulic actions, the velocity of the water caused a scouring whereby sand and gravel were deposited in varying depths. The physiographic features of the river and terrain caused riffles and eddies permitting sediment accumulations at the slower moving places.

Because of construction and road building, this natural deposit of sand and gravel has become an important economic resource. Some sand and gravel may be found in deposits presently on land sites. The deposits here in question, however, are all located under the navigable waters of the Allegheny River. The sand and gravel run to depths of about 40 feet.

The present-day dredging operations are carried out by means of ladder dredges, clamshell buckets, dragline

and front-load shovels. The dredges maintain a square face at the upstream and downstream ends of the dredge pools. Normally the annual progress along the stream axis is about 200 feet longitudinally for each of the Gravel Companies. The dredging techniques in the Allegheny River involve the lowering of buckets into a hole dug in the river bottom. The loaded bucket is raised to the stream water surface, held for a few seconds to allow excess water to drain, and then the sand and gravel are dumped onto barges which flank the dredge barges. The stationary dredge barge, which is about 35 feet wide, is normally flanked on both sides by transport barges about 26 feet wide. A typical section of the Allegheny River where dredging exists is about 1,000 feet wide at mean low water. As the digging progresses, the face of the dredge pool becomes an inclined slope caused by the force of water forcing additional sediment into the hole, thereby permitting a reworking of previously dredged areas. A dredged pool eventually becomes an eddy. The dredging season is from about the end of March to December and apparently involves a six-day work week. Since the construction of flood-control dams, such as Kinzua Dam, the natural flow of water is to some degree controlled, which apparently results in less scouring and, interestingly, has lowered the temperature of the water in the Allegheny River. The upper Allegheny River, where this type of dredging has taken place for more than a hundred years, supports an abundant fish population both above and below the dredging operation. The water in the upper Allegheny is of a high quality.

The Gravel Companies have maintained dredging operations in this area for about 45 years. Much of the sand and gravel removed by the Gravel Companies is purchased and used in the construction and maintenance of highways by the Pennsylvania Department of Trans-

portation (PennDOT).[2] During 1971 the total production of sand and gravel by the dredging operations of the Gravel Companies amounted to about 500,000 tons per year. In that year, Oil City and Warren produced 211,000 and 275,000 tons respectively. In 1972, because of the matters involved in this case, their tonnage was reduced to 177,000 tons and 56,000 tons respectively.

Most important to our determination is the recognition by all the parties involved that the sand and gravel contained in the bed of the Allegheny River is a natural resource owned by the people of the Commonwealth. It therefore follows that, although the Gravel Companies contend they have some sort of vested rights because of their long-time dredging operations and millions of dollars worth of investment, the property right in the sand and gravel remains with the people of the Common-

---

2. We note that DER appears to apply a double standard in its regulation of water quality. In two very recent cases before this Court, PennDOT rendered useless pure waters of the Commonwealth used for public water supplies so as to permit the construction of public highways. See *Keystone Water Company v. Pennsylvania Public Utility Commission*, 19 Pa. Commonwealth Ct. 292, 339 A.2d 873 (1975); *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company.* 19 Pa. Commonwealth Ct. 214, 341 A.2d 239 (1975). In those cases DER made no movement whatsoever to carry out what it believes to be its trustee duties under Article I, Section 27 of the Pennsylvania Constitution of 1968. Rather, it permitted PennDOT to completely destroy those extensive water rights. If those cases are any criteria, then it would appear that if PennDOT decides to dredge the sand and gravel in the Allegheny River at the same places where DER opposes the dredging in this case (calling to mind that PennDOT receives much of the sand and gravel here in question) DER will make no move to restrict PennDOT's dredging. If previous cases are any criteria, DER will permit PennDOT to proceed uninhibited and place the burden of correcting any resultant pollution problem upon water utilities and riparian owners downstream. This apparent double standard is becoming more troublesome to this Court as we continue to review environmental cases.

wealth, and not with the Gravel Companies. It has long been held that the land under navigable streams belongs to the Commonwealth. As early as 1826 our Pennsylvania Supreme Court in *Shrunk v. Schuylkill Navigation Company*, 14 S. & R. 71, 80, stated:

> "[T]he soil over which our great rivers flow . . . has never been granted to any one, either by William Penn, or his successors, or the state government. Care seems to have been taken, from the beginning, to preserve the waters from [sic] public uses, both of fishery and navigation. . . ."

Chief Justice TILGHMAN stated in that case "the entire right to the soil and water of the river remained vested in the state, for the benefit of the public. . . ." 14 S. & R. at 80. *See also Illinois Central Railroad Company v. Illinois*, 146 U. S. 387 (1892) and *Conneaut Lake Ice Company· v. Quigley*, 225 Pa. 605, 74 A. 648 (1909).

Apparently for decades the Commonwealth did not specifically regulate its sand and gravel resources. The government did, however, regulate dams, bridges and other water obstructions by the Act of June 25, 1913, P.L. 555, *as amended*, 32 P.S. §681 et seq. (commonly called the Water Obstructions Act). Section 2 of the Water Obstructions Act, 32 P.S. §682, is involved in the instant case, and it reads in pertinent part as follows:

> "[I]t shall be unlawful for any person . . . in any manner to change or diminish the course, current, or cross section of any stream or body of water, wholly or partly within, or forming a part of the boundary, of this Commonwealth . . . without the consent or permit of the Water and Power Resources Board, in writing, previously obtained, upon written application to said board therefor."

For more than 20 years after the passage of the Water Obstructions Act, no attempt was made to apply the requirements of the Act to dredging activities. When an attempt finally was made to apply the Water Obstruc-

tions Act to dredging activities, the ensuing litigation resulted in a 1937 decision by the Court of Common Pleas of Dauphin County, which held that the Water Obstructions Act was not applicable to dredging activities. *See McCrady-Rodgers Company v. Colegrove,* 43 Dauph. 275 (1937). In *McCrady,* the court reasoned that the Water Obstructions Act applied only to permanent changes in the current or cross section of a river, but found under the facts presented in that case that dredging causes only a temporary change. The court was influenced by the fact that for over 20 years no one had construed the Water Obstructions Act as being applicable to dredging. *See* 43 Dauph. at 291. Following the *Mc-Crady* decision, the Legislature very quickly amended the Water Obstructions Act. The Act of May 6, 1937, P.L. 559, amended the Water Obstructions Act and added the following language to section 5 thereof:

> "It is the legislative intent that the *provisions of this act shall extend to and include all types of water obstructions,* regardless of the date when they were constructed, and whether or not the same were constructed by permission, express or implied, of the Commonwealth, or of any authorized agency thereof, and *whether temporary or permanent, and to all changes in the course, current or cross section of any stream or body of water, whether such change be temporary or permanent.*" (Emphasis added.)

This language, together with the other changes made by the 1937 amendment, indicates a legislative intent that the Water Obstructions Act should apply to dredging. The record in this case indicates that the Water and Power Resources Board (predecessor to DER) has required dredging companies (including the Gravel Companies involved in this case) to obtain permits pursuant to the Water Obstruction Act, since the time of the 1937 amendment.

Eventually the Legislature specifically provided for the lease or sale of sand and gravel by the Act of Sep-

tember 16, 1961, P.L. 1348, §1, which added subsection (d) to section 1808 of the Administrative Code of 1929 (Code), Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §468. Section 1808(d)[3] of the Code gave authority to the Water and Power Resources Board to enter into agreements to sell, lease or otherwise dispose of sand and gravel found in or beneath the bed of navigable streams on such terms and conditions as that Board deemed to be in the best interest of the Commonwealth. Then a strange legislative development took place. By the Act of July 31, 1970, P.L. 699 (Act No. 225), section 1808(d) of the Code was amended to provide that agreements under section 1808(d) would operate as dredging permits, but that such dredging would be subject to certain specific royalty payments to be made to the Pennsylvania Fish Commission. However, before the printer's ink used in the printing of Act No. 225 could be said to be fully dried, the Legislature passed the Act of December 3, 1970, P.L. 834 (Act No. 275), making wholesale amendments to the Code, and repealing all of the provisions of Article 18, including section 1808(d) previously amended just six short months before. Under Act 275, the Water and Power Resources Board was abolished, and its powers and duties were vested in DER. *See* section 1901-A(1) of the Code, 71 P.S. §510-1(1) (Supp. 1974-1975). Act No. 275 became effective January 19, 1971, prior to the filing of the applications in this case. In place of the former section 1808, Act No. 275 added section 1908-A, 71 P.S. §510-8 (Supp. 1974-1975), which reads in pertinent part as follows:

"The Department of Environmental Resources shall have the power and its duty shall be:

"(1) [T]o continue to exercise the powers and perform the duties by law vested in and imposed

---

3. The wording of this section 1808(d), now repealed, is exactly the same as the present section 1908-A(3) of the Code, quoted *infra.*

upon the . . . Water and Power Resources Board, or in and upon the department, with regard to:

. . . .

"(d) Consents or permits for changing or diminishing the course, current, or cross section, of any stream or body of water;

. . . .

"(3) To enter into agreements to sell, lease or otherwise dispose of any iron, coal, limestone, fireclay, oil, gas and other minerals, *except sand and gravel and minerals deposited as silt in pools created by dams,* that may be found in or beneath the beds of navigable streams or bodies of water within the Commonwealth and non-navigable streams or bodies of water where the beds thereof are owned by the Commonwealth, on such terms and conditions as the board deems to be in the best interest of the Commonwealth: Provided, however, That any proposed contracts involving more than one thousand dollars ($1,000) shall be awarded to the highest responsible bidder after due advertisement as prescribed by the board. Nothing herein contained shall authorize anyone to interfere with the free navigation of said streams or bodies of water or to undermine the bed thereof or to interfere with the rights of any person or persons holding property on the banks thereof." (Emphasis added.)

Section 1908-A(1)(d) of the Code merely notes that DER shall exercise the authority previously vested in the Water Power and Resources Board with regard to permits under section 2 of the Water Obstructions Act (quoted above), while section 1908-A(3) replaces the provisions of section 1808(d) regarding agreements to sell and lease sand and gravel. Certain of the words of section 1908-A(3) of the Code, as emphasized immediately above (". . . except sand and gravel and minerals deposited as silt in pools created by dams . . .") have

caused this Court some difficulty. There appears to be an extra "and" in the phrase, and this has caused some confusion. Does the phrase disclose a legislative intent to exclude all "sand and gravel" from the provisions of section 1908-A(3), or only "sand and gravel" deposited as silt in pools created by dams? After much research and contemplation, we interpret the exclusionary phrase to apply only to "sand and gravel" deposited as silt in pools created by dams. We note that in the Act of April 11, 1848, P.L. 533, 64 P.S. §262 et seq., pertaining to warrants to dig and mine in navigable rivers, that that Act applied to "iron, coal, limestone, sand and gravel, fire-clay, and other minerals". It appears that "sand and gravel" is a term of art, and therefore what appears to be an extra "and" in section 1908-A(3)¹ in reality is literally correct. We also note that in the short lived Act 225, a comma was placed after the word "sand" in both the title and the act itself, so that it read "(d) To enter into agreements to sell, lease or otherwise dispose of any iron, coal, limestone, fire-clay, oil, gas, sand, gravel and other minerals. . . ." But six months later the Legislature in Act 275 returned to the 1848 legislative phraseology, which is found in all of the other statutes we have reviewed. Because the exclusionary phrase (of section 1908-A(3)) in question is an exception to the general power given to lease and sell, it should be interpreted narrowly rather than broadly. Following this reasoning we hold that only "sand and gravel" deposited as silt in pools created by dams is excepted from the provisions of section 1908-A(3), and, therefore, in the instant case, DER had the authority to lease or sell the sand and gravel in or beneath the bed of the Allegheny River. In addition, we note that since the Federal government controls the operation of dams in navigable rivers, the exception makes practical sense.

This particular determination is not necessarily controlling in the result of the case, however, for, as the

following discussion will reveal, DER has the authority to regulate the dredging of a navigable river under the provisions of the Water Obstructions Act.

The Gravel Companies have presented several issues. They contend that the findings of the Board were not supported by substantial evidence. They contend that the Board did not give sufficient weight to the economic impact of its order. They question the power of DER to require a permit for dredging, and contend that the conditions imposed upon the Gravel Companies with the permits were subject to the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §1101 et seq. (Supp. 1974-1975), because they were in effect rules and regulations. The Gravel Companies also contend that the Board improperly placed the burden of proof upon them. In the cross appeal DER contends that the Board committed an error of law by extending the area into which the Gravel Companies could dredge, as provided in the Board's order. DER also contends that the Board was without power to change the permit issued by DER.

Our scope of review in these cases is governed by section 44 of the Administrative Agency Law, 71 P.S. §1710.44, which provides that:

"[T]he court shall affirm the adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law . . . or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may set aside or modify it, in whole, or in part, or may remand the proceeding to the agency for further disposition in accordance with the order of the court."

Section 1908-A (1) (d) of the Code and section 2 of the Water Obstructions Act show a legislative intent to regulate any change in the course, current or cross sec-

tion of any river. However, when we look to the published regulations relating to the Water Obstructions Act, found at 25 Pa. Code §105.1 et seq., we find no specific rules and regulations pertaining to dredging. It is quite obvious from a reading of those rules and regulations that their primary intent was to regulate the construction of obstructions in navigable streams. While the rules and regulations make reference to dams, bridge abutments, wharves, etc., there is not one word in all of those rules and regulations pertaining to dredges or dredging operations. These published rules, which DER contends regulate the issuance of permits for dredging operations, are of the vaguest kind and perhaps unreasonably so. The regulations do not mention dredging; instead they merely restate the language found in section 2 of the Water Obstructions Act, 32 P.S. §682, which provides that it shall be unlawful to change or diminish the course, current or cross section of any stream without a permit. *See* 25 Pa. Code 105.3, 105.61 and 105.63. However, we will not consider the adequacy of the applicable regulations because the Gravel Companies have not raised that as an issue. Rather the Gravel Companies have raised the question of whether the terms and conditions attached to the permits were in and of themselves rules and regulations. We hold that the terms and conditions attached to the permit are terms and conditions of the permit, rather than rules and regulations. Section 4 of the Water Obstructions Act, 32 P.S. §684, gives DER the power to incorporate terms and conditions in a permit and DER's regulations specifically provide that permits issued pursuant to the Water Obstructions Act shall be "subject to such stipulations and special conditions as may be deemed necessary in the interests of the public." *See* 25 Pa. Code 105.21 and 105.77.

The Gravel Companies initiated this matter by the filing of applications for permits and, therefore, they were the moving parties with the burden to prove that

they were entitled to the permits they sought. As we view the procedure in cases such as this, the Gravel Companies would have the burden before the Board of proving that the conditions which DER attached to the permit were unreasonable, unlawful, unconstitutional, or not in the interest of the public. Based upon the record made, it would be the duty of the Board to make findings of fact, based upon substantial evidence in the record, and to make such conclusions of law as can be supported by those findings. On that issue we have carefully read this entire voluminous record, and we conclude that all of the findings of fact necessary to support the Board's adjudication are supported by substantial evidence.

The Board stated in its adjudication that the permits which were issued by DER serve a dual purpose as (1) leases for the Commonwealth's proprietory interest in minerals in the stream bed pursuant to section 1908-A(3) of the Code, 71 P.S. §510-8(3), and (2) permits regulating the activity of dredging pursuant to section 2 of the Water Obstructions Act, 32 P.S. §682. We have some difficulty with the contention that these permits serve as leases pursuant to section 1908-A(3) of the Code.

As we noted above, section 1908-A of the Code (added by Act No. 275), 71 P.S. §510.8 (Supp. 1974-1975), which was in effect on the date of the filing of the applications for permits in this case, provides that DER may enter into agreements for the sale, lease or disposal of sand and gravel found in the beds of navigable streams on such terms and conditions as it deems to be in the best interest of the Commonwealth. However, there is a proviso in section 1908-A(3), providing that any proposed contract which involves more than $1,000 shall be awarded only to the highest bidder after public notice. There is nothing in this record to indicate that the legislative requirement of public bidding was ever initiated or carried out by DER. The permits involved in this case

and the acts of the parties indicate that both DER and the Gravel Companies operated under the mistaken assumption that section 1808 of the Code (as amended by Act. No. 225) was still in effect when the Gravel Companies applied for and received their permits. One of the terms and conditions attached to the permits refers to Act No. 225 and notes the requirement of payments to the Pennsylvania Fish Commission. As noted above, Act No. 225 had been repealed when the permits were applied for and issued, and the applicable section of the Code was section 1908-A, which requires public bidding for contracts in excess of $1,000. The record in this case does not indicate whether the public bidding requirement of section 1908-A(3), was satisfied, but none of the parties have raised this issue and, therefore, we will not pass on the question of whether the permits properly serve as leases pursuant to section 1908-A(3) of the Code. We will assume that all of the statutory provisions pertaining to the lease or sale were fulfilled.

We affirm the Board's order to the extent that it approves the issuance of dredging permits subject to specified terms and conditions because we can find specific statutory authority for DER to issue permits regulating changes in the course, current or cross section of streams in the Commonwealth. *See* section 1908-A(1)(d) of the Code, 71 P.S. §510-8(1)(d) (Supp. 1974-1975) and section 2 of the Water Obstructions Act, 32 P.S. §682.

DER has raised some questions on whether the Board can review DER's actions in granting leases or bills of sale for such sand and gravel. We resolve this issue by reference to section 1921-A(c) of the Administrative Code of 1929 (added by Act No. 275), 71 P.S. §510-21(c) (Supp. 1974-1975) which provides that:

"(c) Anything in any law to the contrary notwithstanding, any action of the Department of Environmental Resources may be taken initially without regard to the Administrative Agency Law, but no

such action of the department adversely affecting any person shall be final as to such person until such person has had the opportunity to appeal such action to the Environmental Hearing Board; provided, however, that any such action shall be final as to any person who has not perfected his appeal in the manner hereinafter specified."

This particular section permits DER to hold an initial fact finding hearing without permitting cross-examination, but after such fact finding hearing, any action taken by DER is reviewable by the Environmental Hearing Board under subsection (c) quoted above. In other words, the Legislature wisely provided that DER shall not have unrestrained or arbitrary power to enter into agreements or issue permits, but rather has provided that such actions are reviewable by the Board under the Administrative Agency Law.

We should also highlight at this point another incorrect contention of DER. DER seems to argue that this Court should review DER's actions for abuse of discretion or error of law rather than review the adjudication of the Board. This is incorrect. The Administrative Agency Law clearly indicates that we must review the adjudication of the Board rather than the administrative action which was reviewed by the Board. *See* section 44 of the Administrative Agency Law, 71 P.S. §1710.44. In cases such as this, we are not required to review an administrative decision by DER which was rendered without a due process hearing, because as we view the Administrative Agency Law and section 1921-A of the Code, when an appeal is taken from DER to the Board, the Board is required to conduct a hearing *de novo* in accordance with the provisions of the Administrative Agency Law. In cases such as this, the Board is not an appellate body with a limited scope of review attempting to determine if DER's action can be supported by the evidence received at DER's factfinding hearing. The

Board's duty is to determine if DER's action can be sustained or supported by the evidence taken by the Board. If DER acts pursuant to a mandatory provision of a statute or regulation, then the only question before the Board is whether to uphold or vacate DER's action. If, however, DER acts with discretionary authority, then the Board, based upon the record made before it, may substitute its discretion for that of DER. *See East Pennsboro Township Authority v. Commonwealth of Pennsylvania, Department of Environmental Resources,* 18 Pa. Commonwealth Ct. 58, 334 A. 2d 798 (1975) and *Rochez Bros., Inc. v. Commonwealth of Pennsylvania, Department of Environmental Resources,* 18 Pa. Commonwealth Ct. 137, 334 A. 2d 790 (1975). DER's authority to attach terms and conditions to the permit in the instant case was obviously discretionary and, therefore, the Board could properly substitute its discretion concerning the terms and conditions for that of DER. In carrying out its function, the Board properly called for a balancing of the adverse environmental impact of dredging against the economic impact of DER's terms and conditions. Whether we agree with the quantative basis for the balance used by the Board is of no moment. What is important is that there is substantial evidence in the record to support the Board's balancing in this case, especially in view of the fact that the extension of dredging allowed by the Board was temporary in time and reasonable in extent.

In closing, we admonish DER and the Environmental Quality Board to amend the rules and regulations so as to specifically provide for the requirements, restrictions and conditions which any citizen desiring to dredge may have to follow in order to obtain the necessary permit. The present system requires a citizen to guess what requirements he may be subjected to upon the filing of an application for a dredging permit, and allows DER, on an ad hoc basis, to subject such citizens to whatever

terms and conditions it believes necessary. Such a system is wholly unacceptable. Anyone desiring to operate a smokestack in this Commonwealth can look at regulations to determine precisely what is required, but a dredger has nowhere to look for similar regulations. Due process of law requires fairness. This is not a case where a citizen desires to initiate dredging. This is a case where these dredgers have been in operation for more than 45 years. They have expended millions of dollars in investment. Their payroll involves many employes and is measured annually in hundreds of thousands of dollars. Under such circumstances, due process of law requires government to at least notify all parties concerned on what the rules of the game are. Changing the rules in the middle of the game is constitutionally questionable, particularly when the changes might very well put the Gravel Companies out of business.

In summary, we hold that DER has authority to sell the sand and gravel in question pursuant to Section 1908-A(3) of the Code. We also hold that DER has authority to regulate dredging activities pursuant to section 1908-A(1)(d) of the code, and section 2 of the Water Obstructions Act, and that the permits involved in the instant case, including the approved terms and conditions, are a valid exercise of that authority. In this case the Board quite properly reviewed the exercise of authority by DER and properly considered all of the factors involved, including both environmental harm and economic impact. As noted above, all of the findings of fact necessary to support the Board's adjudication are supported by substantial evidence.

In accordance with the above we therefore

### ORDER

AND NOW, this 9th day of July, 1975, the order of the Environmental Hearing Board, dated May 3, 1974, which provides for the issuance of dredging permits

pursuant to section 1908-A (1) (d) of the Administrative Code of 1929, 71 P.S. §510-8 (1) (d) (Supp. 1974-1975) and section 2 of the Water Obstructions Act, 32 P.S. §682, and sets terms and conditions to be contained in those permits, is affirmed.