## General Investment and Development Co. Inc. v. D.E.R.

*John A. VanLuvanee*, for appellant.
*Kenneth A. Gelburd*, for Commonwealth.

MAZULLO, Jr., *Member*, May 6, 1983—This matter comes before the board upon an initial appeal by General Investment and Development Company, Inc., (GID), West 202 Corporation (202), and subsequently prosecuted solely by Apex Financial Corporation (APEX), appellant herein, from the action of the Department of Environmental Resources (DER) in rejecting a request for a modification or exception to the June 21, 1979 ban imposed on further connections to the Chalfont-New Britain Treatment Plant in Bucks County, Pa.

In rejecting appellant's request for 32 additional units in the development known as Olde Colonial Green located in Doylestown Township, Bucks County Pa., DER was of the opinion that appellant's consulting engineers' estimate of water savings was "overly optimistic," and therefore did not constitute "sufficient information to waive the requirements" of a consent order and agreement entered into between DER and GID and 202 dated February 8, 1980 wherein GID and 202 "agreed not

to seek further exceptions to the ban on connections to the Chalfont-New Britain plaint."

After an evidentiary hearing, at which hearing DER offered no testimony, post-hearing briefs were filed, and the matter is ripe for decision by this board.

## FINDINGS OF FACT

1. Appellant is Apex Financial Corporation (APEX), Benjamin Fox Pavilion, Jenkintown, Pa.

2. Appellee is the Commonwealth of Pennsylvania, Department of Environmental Resources (DER), the agency of the Commonwealth authorized to administer the provisions of The Pennsylvania Clean Streams Law, the Act of June 22, 1937, as amended, 35 P.S. §691.1, et seq., and the provisions of regulations promulgated in furtherance thereof and specifically relating to Municipal Wasteload Management, 25 Pa. Code Chapter 94.

3. On May 23, 1973, General Investment and Development Company, Inc., (GID) entered into an agreement with the Bucks County Water and Sewer Authority (BCWSA) whereby BCWSA agreed to provide sewage treatment for 344 dwelling units contemplated to be constructed in a development known as Olde Colonial Greene, located in Doylestown Township, Bucks County, Pa.

4. On August 17, 1978, GID and BCWSA entered into a supplemental agreement (to the May 23, 1973 agreement) whereby BCWSA agreed to accept sewage from 317 dwelling units in the development provided that the total daily flow would be restricted to 55,500 gallons per day.

5. Pursuant to the supplemental agreement of August 14, 1978, GID paid to BCWSA the sum of $57,766.07, which sum represented, inter alia,

payment for connection fees and reserve capacity charges for 317 lots in the Olde Colonial Green development.

6. As of June 21, 1979, and for some time prior thereto, GID had been issued building permits for at least 22 lots in the developments, although no construction had proceeded on these dates.

7. On June 21, 1979, DER issued an order prohibiting "additional discharge into the Chalfont-New Britain Township Joint Authority plant and the tributary municipal sewer systems unless written authorization for the discharge has been granted by the Department (DER) under Section 94.52 for new building permits issued prior to ban and replacement of a discharge as described in Sections 94.55 and 94.59."

8. On September 20, 1979, GID requested that BCWSA seek an exception from the ban of June 21, 1979 from DER for 22 dwelling units, for which units building permits had been issued within one year prior to the said ban.

9. On December 20, 1979, DER denied the request for an exception to the ban for the 22 dwelling units above referenced.

10. After discussion between DER and GID of the December 20, 1979 denial by DER, GID entered into a consent order and agreement dated February 8, 1980 which provided for the connection of 22 dwelling units within Olde Colonial Green to the sewage collection system of BCWSA.

11. APEX was not a party to the consent order and agreement of February 8, 1980, and was not advised by GID, 202, or DER of the negotiations and execution of the agreement.

12. Under the terms of the consent order and agreement of February 8, 1980, GID and 202 did

"agree and promise not to pursue or request any more exceptions to the Ban. . . . "

13. On October 21, 1980, GID and 202 made application to DER for an exception to the ban on the basis that the proposed utilization of water-saving devices in both the existing and the proposed residential dwelling units within the development would permit the construction of 62 additional dwelling units within the development without increasing the total sewage flows from the development.

14. APEX acquired title to the subject premises, after mortgage foreclosure proceedings, by virtue of a deed from the Sheriff of Bucks County, John P. Mitchell, to APEX dated November 12, 1981.

15. On July 8, 1981, DER denied the application of GID and 202 of October 21, 1980 on the basis that their estimate of water savings was "overly optimistic."

16. The estimate of water savings to be realized at the subject development was prepared by Robert C. Schmauk, a registered professional engineer.

17. At the time the estimate was prepared, in May, 1981, the net number of occupied dwelling units in the development amounted to 245 units, and the total population was 560 persons.

18. The number of persons per dwelling unit amounted to 2.3 persons, the product of the total population divided by the total number of occupied units.

19. The average daily flow from the development was derived from the daily and monthly metered records of the Olde Colonial Green Water Company, a public utility; and the average daily flow was calculated at 45,000 gallons per day.

20. By dividing the average daily flow by the

number of dwelling units, Schmauk arrived at the figure of 185 gallons per day per dwelling unit of water consumption.

21. The average use per day per dwelling unit was further divided by the number of residents per dwelling to arrive at the figure of 80 gallons of consumption per day per person in the development.

22. All existing plumbing fixtures in the development were audited for water use, including toilets, showers, sinks, dishwashers and clothes washers.

23. Manufacturers' materials and specifications on flow rates were further augmented by actual measurements of flow rates of the fixtures found in the development.

24. In preparing flow rates per unit, Schmauk assumed each unit contained three toilets, two showers, four sinks, one dishwasher, one clothes washer.

25. In determining what percentage of water usage from a typical dwelling unit was attributed to each fixture, Schmauk used as guidelines the circulars published by DER entitled "Use Water Wisely."

26. Schmauk projected for each of the fixtures, excepting the dishwasher and clothes washer, flow rates for fixtures equipped with water-saving devices.

27. Flows attributable to showers, toilets and sinks equipped with water-saving devices are derived from manufacturers' publications and the aforementioned DER circular.

28. By using saving devices, the average daily flow per dwelling unit was 135 gallons per day, and 59 gallons per day per person in the dwelling unit, as compared with flows of 185 gallons per day per

dwelling unit, and 80 gallons per day per person in the unit.

29. The pamphlet published by DER estimated an average daily per capita usage of 40 gallons per day by the use of water-saving devices.

30. Schmauk's estimate of 59 gallons of flow per person per day per dwelling unit is a conservative opinion based on manufacturers' and DER's guidelines.

31. If appellant's proposals on water savings at the development were implemented, a saving on water flow of 27 percent would be realized.

32. A reduction in flow of 27 percent would amount to the flow of approximately 62 units, by use of the guidelines and the aforementioned analysis.

33. Prior to the preparation of the water savings analysis on behalf of appellants, Schmauk had prepared similar water savings analysis for three other clients for submission to DER as a basis for exceptions to DER's ban on connections to existing sewage treatment facilities, especially, the Chalfont-New Britain facility.

34. In all three instances, the analysis prepared by Schmauk served as the basis for the grant by DER of an exception to the ban, and additional construction was thereby allowed for office expansion, school expansion, and 19 additional dwelling units in a residential development.

35. In the matter of the expansion of the residential development, called "Westwyk" and located in Doylestown Township, Bucks County, the same fixtures and water-saving devices were analyzed as those used in the instant appeal, e.g., toilets, showers, sinks, clothes and dishwashers.

36. The relief sought by appellant herein, an ex-

ception based upon the use of water-saving devices, is the same relief applied for and granted by DER in the three other matters analyzed by Schmauk for clients other than appellants herein.

37. In the three instances where Schmauk submitted applications for exceptions to the ban on additional connections to the Chalfont-New Britain treatment facility, based on the use of water-saving devices, DER granted exceptions despite the fact that the said facility was, as in the instant matter, hydraulically overloaded at the time exceptions were granted.

38. At the time GID and 202 applied for an exception to the sewer ban based upon the fact that building permits had been issued for the 22 requested connections, the appropriate DER officials knew or should have known that under the provisions of 25 Pa. Code § 94.55 an exception was *mandated* to be granted by DER.

39. The consent order and agreement of February 8, 1980 contemplated relief from the ban on connections in approximately six to nine months therefrom by the construction of an interim treatment plant (ITP) as an auxiliary to the Chalfont-New Britain facility to handle "additional sewage."

40. GID and 202 paid a small subscription fee for the right to be considered a participant in the construction of the ITP.

41. As of the date of the evidentiary hearing, March 31, 1982 the principal of GID and 202, William A. Clarke, was not aware of ITP, Inc., being granted any permits to build the auxiliary interim treatment facility.

42. All sewage emanating from the development, whether in existence or contemplated, must connected to the Chalfont-New Britian Township Joint Sewer Authority sewer system.

43. The addition of 62 additional dwelling units to the existing development would not increase the daily average flow from the development to the sewer system if the proposed water-saving devices were installed and used by the present occupants of the development.

44. A fair reading of the consent order and agreement of February 8, 1980 makes it abundantly clear that the parties to the agreement intended that GID and 202 would be precluded from seeking any additional connections which would generate additional and increased flows to the Chalfont-New Britain treatment facility.

45. DER offered no testimony at the hearing, and offered no witnesses on its behalf at the hearing.

46. The agreement of February 8, 1980 was not presented to this board for review and approval.

47. The agreement of February 8, 1980, was not published in the Pennsylvania Bulletin.

## DISCUSSION

Appellant herein seeks an exception to DER's ban on additional connections to an already overloaded sewage facility. The basis for the requested exception is the projected use of "water-saving devices" for the existing, and projected, units in the development known as Olde Colonial Green located in Doylestown Township, Bucks County, Pa.

DER argues that appellant is barred from seeking additional connections for the development under the terms of a consent order and agreement entered into between DER and appellant's predecessors in title and dated February 8, 1980.

However, the final action appealed from is DER's decision of July 8, 1981, which stated that the anticipated water savings "is overly optimistic" and not sufficient to waive the requirements of the con-

sent order and agreement of February 8, 1980.

Did DER intend, had it determined appellant's projections to be reasonable, that the consent order and agreement prohibition would have been waived and the exception would have been granted? Or did DER intend that appellant did not possess any right to seek any exceptions to the ban of June 21, 1979 by reason of the consent order and agreement of February 8, 1980?

The legal theory presented to the board by DER is that the consent order and agreement of February 8, 1980 is final and enforceable and bars appellants from even *seeking* exceptions to the ban. We agree with the position of DER that DER consent orders are final and enforceable, but that proposition is not at issue in the instant appeal.

At issue in this appeal are the following:

1. Is APEX bound by the agreement of February 8, 1980; and

2. Did DER act arbitrarily and capriciously in concluding that the estimates of water savings were overly optimistic?

If APEX is held to be bound by the terms of the February 8, 1980 agreement, the basis of such a finding can only be grounded upon privity of contract, or knowledge or notice of the agreement.

It is undisputed that APEX was not a party to the agreement in question. Therefore, the agreement of February 8, 1980 cannot be enforced against APEX on that basis.

Was APEX in privity with the parties and therefore subject to the terms of the agreement? Privity of contract has been defined as:

"that connection or relationship which exists *between two or more contracting parties.*" Black's Law Dictionary, Revised Fourth Edition, 1968.

APEX was not one of "two or more contracting parties," and had no connection or relationship with the contracting parties to that agreement of February 8, 1980.

The record clearly shows that not only was APEX not involved in the negotiation and execution of the agreement, APEX had no knowledge or notice of the negotiation and execution of the agreement.

In concluding the agreement, the parties did not submit the finished product to this board for review and approval. Neither did the parties submit the agreement to the Pennsylvania Bulletin for publication therein.

Not having had actual knowledge of the concluding of the agreement, APEX cannot be held bound by the terms of the agreement unless it had notice of the agreement.

There is no doubt but that publication in the Pennsylvania Bulletin may have constituted such notice to APEX. Without publication, there is no notice to APEX.

In an appeal decided by this board within the past year (1982), the board held that publication in the Bulletin "constituted notice of the CD&A (consent decree and agreement) to affected parties. . . . " Lower Paxton Township Authority, et al. v. Commonwealth of Pa., Department of Environmental Resources, EHB Docket no. 80-205-W, (Decided July 16, 1982).

Since APEX was not in privity with the contracting parties, and had no knowledge of the agreement, and had no notice, actual or constructive, of the agreement, the agreement cannot be enforced against APEX, and we so hold. However, we do hold that the agreement is binding and enforceable against the parties to the agreement.

We are now left with the question of whether or

not DER was arbitrary and capricious in determining that APEX estimates of water savings was "overly optimistic."

The evidence adduced by APEX at the evidentiary hearing was given by a registered, professional engineer whose qualifications were not questioned. He answered questions put to him in an honest and forthright manner, and we have no reason to question his expertise or integrity. Not only did the witness outline in detail his reasons why he felt that the use of water-saving devices would not increase the flow from the development, he also outlined in detail the methods used to arrive at his conclusions. The estimated water savings were based on manufacturers' specifications for each such device, and on DER published pamphlets concerning the use of water-saving devices and consequent reduced flow from the development. In addition, the testimony of the expert witness revealed that he had used the same estimates on the use of the same water-saving devices on behalf of other clients, in requests to DER by such clients for additional sewer connections to the Chalfont-New Britain plant after the ban had been imposed, and that DER granted such requests.

Further, the witness testified that the projected water savings had proven to be conservative in practice in those instances where DER had allowed additional connections based on the use of water-saving devices.

In the face of all the above testimony, DER chose not to introduce any testimony to substantiate its conclusion that the estimate of water savings submitted by APEX was "overly optimistic." DER offered no witnesses and no exhibits on its behalf, at the hearing on this appeal, although it was rep-

resented at the hearing by one of its officials and by counsel.

The only effort made by DER to defend its position was to move that summary judgment be enforced in its favor for the reason that the agreement of February 8, 1980 acted as a bar to appellants' position. The hearing examiner denied the motion, and, we think, properly so, for the reasons stated hereinbefore in this adjudication.

Despite the fact that DER did not offer any testimony in the course of the hearing, APEX, nevertheless, bears the burden of proof in this proceeding since it is appealing from the action of DER in refusing to grant an exception to a sewer ban. This has not been contested by APEX.

The burden of proof in the instant appeal required APEX to establish by a preponderance of the evidence that the use of water-saving devices would enable APEX to construct 62 additional housing units at the development without adding *any* additional load to the Chalfont-New Britain plant.

As discussed above, the testimony of the professional engineer, Robert C. Schmauk, established, without contradiction by DER, that the present average daily flow at the development is 45,000 gallons per day and that the present average use per day per person at the development is 80 gallons. Mr. Schmauk's testimony also demonstrated that the use of water-saving devices would reduce the present average use per person per day to 59 gallons and that the use of water-saving devices in the development would cause a reduction of flow from the development equivalent to the use of 62 units, which is the number of additional units appellants seek to construct at the development.

In light of the above uncontradicted testimony,

we hold that APEX has met its burden of proof with regard to the savings in water and flow from the development to be realized if the water-saving devices were installed at the development.

Our review now proceeds to the determination of the action of DER in determining that the estimates of savings by the appellant's use of water-saving devices was "overly optimistic." The board's review of a DER action is to determine whether DER has committed an abuse of discretion or an arbitrary exercise of its duties or functions. Apollo Corporation v. DER, EHB Docket no. 81-130-G, adjudication dated April 26, 1982, citing Warren Sand & Gravel v. DER, 20 Pa. Commw. 186, 341 A. 2d 556 (1975), and if DER has acted arbitrarily or abused its discretion, this board can substitute its discretion for that of DER. Warren, supra.

In this appeal, DER chose not to offer *any* testimony or exhibits to support its conclusion that the use of water-saving devices by appellant APEX would effect the savings estimated by appellants' expert. The record is devoid of any factual or legal reason upon which DER based its decision to refuse to grant approval for the requested connections. In contrast to this void, appellant's witness testified, in addition to the expected reduction in flow to be realized by the use of the water-saving devices, that DER has accepted such estimates in previous submissions by the same expert on behalf of other clients, as the basis for granting requests for additional connections to the Chalfont-New Britain plant after the ban was imposed.

In the face of such uncontroverted facts, we can only conclude that DER had no reasonable basis for denying appellant's request, and without evidence of a reasonable basis for denying appellants re-

quest, DER is found to have acted arbitrarily and therefore abused its discretion.

DER argued strenuously during the course of this proceeding, and in its posthearing brief, that APEX was barred as a matter of law from any relief from the terms of the agreement, basing its arguments upon the conclusiveness of the agreement, and also asserting the directive of res judicata as being applicable herein.

The res judicata argument is not applicable herein since APEX, the only party in interest at the time of the hearing, was not a party to the agreement and therefore the identity of the persons requirement has not been established.

By making its decision to not present any testimony at the hearing, DER assumed the risk that the appeal might be decided, in part, on the facts established by appellant. While we are reluctant to move to final adjudication without a full presentation of all the relevant facts in any proceeding, we cannot force a party to participate fully in the introduction of testimony and evidence. Since DER was represented at the hearing and was given the opportunity to present its case, we can only reason that it had its own reasons for not contesting appellant's evidence and testimony, and must therefore accept the consequences of its action, or nonaction.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the subject matter and the parties.

2. Appellants met their burden of proof in the instant appeal.

3. DER's rejection of appellant APEX request for 62 additional connections at its Olde Colonial

Green development in Doylestown Township, Bucks County, Pa. was arbitrary and capricious.

4. Appellant APEX is legally entitled to the grant by DER of approval of their request for 62 additional sewer connections based upon the use of water-saving devices in the constructed and projected units at the development.

## ORDER

And now, May 6, 1983, appellant's appeal is granted and DER is directed to issue approval of appellant's request for 62 additional sewer connections at its development, Olde Colonial Green, located in Doylestown Township, Bucks County, Pa., upon the conditions requested by appellants in its submission to DER.