102 Pa. Commonwealth Ct. 452 (1986)
519 A.2d 522
Commonwealth of Pennsylvania, Department of Environmental Resources, Petitioner
v.
Pennsylvania Mines Corporation, Respondent.
No. 2507 C.D. 1985.
Commonwealth Court of Pennsylvania.
Argued October 9, 1986.
December 12, 1986.
*453 Argued October 9, 1986, before Judges CRAIG and DOYLE, and Senior Judge BLATT, sitting as a panel of three.
*454 William F. Larkin, Assistant Counsel, for petitioner.
R. Henry Moore, Rose, Schmidt, Chapman, Duff & Hasley, with him, Joseph T. Kosek, Jr., for respondent.
OPINION BY JUDGE DOYLE, December 12, 1986:
The Department of Environmental Resources (DER) appeals from an order of the Environmental Hearing Board (Board) which vacated DER's order requiring Pennsylvania Mines Corporation (PMC) to cease operating a coal mine elevator until repairs were made to it. We affirm.
PMC operates a coal mine known as the Greenwich No. 2 Mine (Greenwich Mine), a deep mine subject to the provisions of the Pennsylvania Bituminous Coal Mine Act (Act), Act of July 17, 1961, P.L. 659, as amended, 52 P.S. §§701-101 to 701-706. One method of ingress and egress from the Greenwich Mine is the South No. 2 elevator (South elevator). In addition, two other elevators and a drift entry are available for mine workers to use in entering and exiting the Greenwich Mine.
The South elevator, which travels a shaft of approximately 440 feet, is electrically powered and designed to be operated in three modes: the automatic mode, the inspection mode, and the attendant mode. In the automatic mode, the South elevator operates similarly to any modern office elevator in that, via various electrical circuits, it starts and stops on its own through the depression of buttons both inside the elevator and at the landings, it levels itself at the landings, and the doors open and close automatically.[1] By contrast, in the inspection *455 mode the automatic circuits are by-passed; a specially trained operator uses an on-board control box to operate the elevator, and the leveling and door opening and closing functions must be done manually. PMC on occasion has used the South elevator in the inspection mode to transport miners when a malfunction has occurred in the automatic mode.[2]
Pursuant to written approval by DER, PMC placed the South elevator into service on January 14, 1974. Before the South elevator was approved it was tested in all three operating modes, and it is undisputed that DER would not have approved the South elevator had there been a defect in any of the three modes. The DER approval, however, did not state that a defect or failure in one mode would require an immediate shutdown of the other modes.[3]
In January 1984, during an inspection visit to the Greenwich Mine, two DER inspectors, Ardini and Johnson, rode in the South elevator while it was being operated in the inspection mode, apparently due to a defect in the automatic mode. According to the inspectors, the doors on the South elevator partially opened while the elevator was operating; the elevator did not stop when this happened; the doors did not close by themselves; and the operator held the doors together with his foot while the elevator continued. The inspectors, by letter dated January 27, 1984, in effect *456 ordered PMC to cease operating the South elevator until repairs were made to the automatic mode.[4] As authority for their order, the inspectors cited Section 306 of the Act, 52 P.S. §701-306, which provides:
In the event of a breakdown or damage or injury to any portion of the electrical equipment in a mine, or overheating, or the appearance of sparks or arcs outside of enclosed casings, or in the event of any portion of the equipment not a part of the electrical circuit, becoming energized, the equipment shall be disconnected from its source of power, the occurrence shall be promptly reported to a mine official, and the equipment shall not be used again until necessary repairs are made.
*457 PMC requested that a commission be appointed to review the determination of the mine inspectors pursuant to Section 123 of the Act, 52 P.S. §701-123. The commission upheld the order of the inspectors, concluding that operating the South elevator in the inspection mode, with the door operation and leveling circuits by-passed, presented a safety hazard and that Section 306 precluded operating any electrical equipment when any part is inoperable because of damage or breakdown. PMC appealed the commission's report to the Board, which sustained PMC's appeal and vacated DER's order, holding that a mine elevator is not "electrical equipment" within the meaning of Section 306, that a mine elevator is "electrical equipment" within Section 118 of the Act,[5] and that DER abused its discretion in ordering an immediate shutdown and repair of the South elevator. DER appeals.[6]
We begin by noting that our scope of review of Environmental Hearing Board adjudications is limited to determining whether constitutional rights have been violated, legal errors have been made, or necessary findings of fact are unsupported by substantial evidence. A. H. Grove & Sons, Inc. v. Department of Environmental Resources, 70 Pa. Commonwealth Ct. 34, 452 A.2d 586 (1982).
*458 The first issue presented by DER on this appeal is whether the Board erred in determining that Section 306 of the Act does not apply to coal mine elevators because the elevators are not "electrical equipment" within the meaning of that Section. In essence, Section 306 mandates that defective "electrical equipment" in a coal mine be shut down until necessary repairs are made. The Board ruled that coal mine elevators are not encompassed within the term "electrical equipment" as used in Section 306. Instead, the Board held that coal mine elevators fall within the ambit of Section 118 of the Act, 52 P.S. §701-118, which empowers a DER electrical inspector to order a mine operator to correct unsafe and defective "electrical equipment" within a prescribed time, and to order a shutdown if the repairs are not made.
DER presents an admixture of statutory construction and public policy arguments to bolster its contention that Section 306 covers coal mine elevators. Essentially, DER argues that Section 306 is clear and unambiguous and, even if there is some ambiguity, Section 306 ought to be given a liberal interpretation in order to promote the public interest in the health, safety and welfare of bituminous coal mine workers.
We certainly do not agree with DER that Section 306 is crystalline and free from ambiguity. "Electrical equipment" is a broad term that is nowhere defined in the Act. See Section 103 of the Act, 52 P.S. §701-103. Moreover, as the Board noted, the term appears to be used differently in different portions of the Act. See Sections 118, 301, 302, 306 and 319 of the Act, 52 Pa. P.S. §§701-118, 701-301, 701-302, 701-306 and 701-319. Therefore, the Board did not erroneously disregard the plain meaning of the term "electrical equipment"; rather, it properly turned to principles of statutory construction to divine the meaning of these ambiguous words.
*459 Under Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa. C. S. §1921(a), a statute is to be construed, if possible, to give effect to all its provisions. In fact, it may be presumed under Section 1922(2) of that Act that the legislature intended the whole statute to be effective and certain. 1 Pa. C. S. §1922(2); see Black v. Billy Penn Corp., 72 Pa. Commonwealth Ct. 628, 457 A.2d 192 (1983). The Board correctly applied these provisions when it found that not all defects in electrical equipment require the immediate shutdown commanded by Section 306 of the Act. To hold otherwise would cause that portion of Section 118 which gives an electrical inspector the discretion to permit defective electrical equipment to operate for a period of time while the defect is being cured to be rendered mere surplusage.
Furthermore, a review of the entire Article III of the Act, of which Section 306 is a part, fails to disclose a single instance in which coal mine elevators are mentioned. By contrast, Article IIK of the Act, 52 P.S. §§701-263 to 701-267, entitled "Hoisting," specifically mentions and deals with the topic of coal mine elevators. Accordingly, this Court agrees with the Board that, notwithstanding that coal mine elevators do involve electrical motors, switches, etc., the legislature conceived of coal mine elevators as "hoisting equipment" which are subject to Section 118 of the Act, but not Section 306.
We also reject DER's public policy contention that holding Section 306 inapplicable to defective coal mine elevators poses a threat to the health, safety and welfare of mine workers. As the Board properly noted, DER is not left powerless to act against defective coal mine elevators; if an electrical malfunction of an elevator occurs "which may be detrimental to the lives or health of the workmen," under Section 118 DER can order the elevator to be fixed within a certain time and, if it is not repaired, prohibit its continued operation.
*460 In sum, then, we hold that Section 306 of the Act does not apply to defective coal mine elevators.[7] Since it is Section 118 of the Act, not Section 306, which applies to coal mine elevators, it is obvious that DER had to first order PMC to repair the elevator within a prescribed time before it could order PMC to cease operating the elevator. Section 118 of the Act, 52 P.S. §701-118. Because DER failed to first order repairs to the elevator, its shutdown order was invalid under Section 118 and we affirm the Board's analysis in this regard.
The Board went further, however, and also ruled that DER had the power under other law, Section 7 of the Pennsylvania General Safety Law (Law), Act of May 18, 1937, P.L. 654, as amended, 43 P.S. §25-7, to order an immediate shutdown of the South elevator without giving PMC an initial opportunity to repair it if DER could show that the unrepaired elevator was hazardous in all modes. The Board held that DER failed to meet this burden; DER is contending that it did meet its burden; and PMC argues that the Board should not even have reached this issue because DER has no authority to enforce the Pennsylvania General Safety Law in this instance, even if the Law does apply to coal mines. We conclude that the position of PMC is correct. Even assuming that the Law applies to coal mines,[8] *461 DER has no authority to enforce it due to Reorganization Plan No. 2 of 1975, 71 P.S. §756-2, which in pertinent part states:
The functions, powers and duties of the Department of Labor and Industry in so far as they relate to regulation of pits, quarries, deep mines other than coal mines, trenches, excavations and similar operations as set forth in [the Pennsylvania General Safety Law] . . . are hereby transferred to the Department of Environmental Resources. (Emphasis added.)
A plain reading of this provision leads to the inescapable conclusion that, regardless of the applicability of the Pennsylvania General Safety Law to coal mines, DER is not the administrative body empowered to enforce it against coal mines,[9] and, therefore, the Board's finding that DER had not met its burden of proof was irrelevant.
Despite the Board's incorrect application of the Pennsylvania General Safety Law, however, we are not compelled to reverse the decision of the Board, because it properly held that DER failed to satisfy Section 118 of the Act, Haney v. Workmen's Compensation Appeal Board, 65 Pa. Commonwealth Ct. 461, 442 A.2d 1223 (1982), and its final holding was correct.
DER last asserts that the Board erred in failing to shift the burden of proof to PMC in this case. DER made the request to shift the burden in a post-hearing brief to the Board, citing 25 Pa. Code §21.101(d). The Board denied the request, concluding that §21.101(d) is not applicable to an appeal of an order directed toward *462 abating a work-place hazard, rather than environmental damage. This Court agrees.
As 25 Pa. Code §21.101(b)(3) provides:
(b) the Department [DER] shall have the burden of proof in the following cases:
. . .
(3) When it orders a party to take affirmative action to abate air or water pollution; or any other condition or nuisance, except as otherwise provided in this rule. . . .
As an exception, Section 21.101(d) provides:
(d) When the Department [DER] issues an order requiring abatement of alleged environmental damage, the private party shall nonetheless bear the burden of proof and the burden or proceeding when it appears that the Department has initially established:
(1) that some degree of pollution or environmental damage is taking place or is likely to take place, even if it is not established to the degree that a prima facie case is made that a law or regulation is being violated; and
(2) that the party alleged to be responsible for the environmental damage is in possession of facts relating to such environmental damage or should be in possession of them.
(Emphasis added.)
It is clear therefore that DER's attempt to utilize section 21.101(d) here must fail. Under the express language of the regulation, Section 21.101(d) applies only in situations where DER orders an environmental hazard abated, not where it simply orders abatement of an alleged work-place hazard. While a work-place hazard may be an environmental hazard as well, there is nothing to indicate that the center of this controversy, the coal mine elevator, presents an environmental hazard. *463 Therefore, 25 Pa. Code §21.101(d) does not apply here, and the Board rightly refused to shift the burden of proof.[10]
Based on the foregoing, the order of the EHB is affirmed.

ORDER
NOW, December 12, 1986, the order of the Environmental Hearing Board, No. 84-152-G dated August 14, 1985, is affirmed.
NOTES
[1] In the automatic mode, the South elevator has a maximum speed of 900 feet per minute and a carrying capacity of 35 persons. In the inspection mode, DER in its approval limited the maximum speed to 100 feet per minute.
[2] The attendant mode is not at issue in this case.
[3] The latest approval, dated March 8, 1984 and substantially similar to earlier approvals, stated in full:

In accordance with Article II, Section 265 of the Pennsylvania Bituminous Mining Laws, permission is hereby granted that no more than (35) persons shall be permitted to be hoisted or lowered at one time, at the South Shaft Portal, Greenwich Collieries Company, No. 2 Mine. The speed of the elevator shall not exceed 900 feet per minute.
[4] The full text of this somewhat vague letter reads:

Dear Sirs:
This order concerning the operation of your elevator in inspection mode, is to inform you that you must comply with the Bituminous Coal Mining Laws of Pennsylvania, Section 306. This elevator must be maintained and operated as it was approved.
Section 306 Report of Defective Equipment.  In the event of a breakdown or damage or injury to any portion of the electrical equipment in a mine, or the appearance of sparks or arcs outside of enclosed casings, or in the event of any portion of the equipment, not a part of the electrical circuit, becoming energized, the equipment shall be disconnected from its source of power, the occurrence shall be promptly reported to a mine official and the equipment shall not be used again until necessary repairs are made.
 Sincerely yours,
 /s/Joseph Ardini
 Mine Inspector,
 District 20
 /s/Donald A. Johnson
 Electrical Inspector,
 District 20

[5] Section 118 of the Act, 52 Pa. §701-118, provides in relevant part that:

[i]f he [electrical inspector] finds during his inspection any defects in the electrical equipment which may be detrimental to the lives or health of the workmen, he shall have the authority to order the operator, in writing, to remedy such defects within a prescribed time, and to prohibit the continued operation of such electrical equipment after such time, unless such defects have been corrected.
[6] The Board also placed certain restrictions on PMC's use of the South elevator in the inspection mode which are not appealed here.
[7] Because of our holding that Section 306 does not apply to coal mine elevators, it follows that the Board could properly substitute its discretion for that of DER, since DER's order was not validly based on a mandatory statutory provision. But cf. Warren Sand & Gravel Co., Inc. v. Department of Environmental Resources, 20 Pa. Commonwealth Ct. 186, 341 A.2d 556 (1975). (Board may not substitute its discretion for DER's when DER acts pursuant to mandatory statute or regulation.)
[8] PMC contends that the General Safety Law does not apply to coal mines at all. In light of our disposition of this case, we need not and do not pass on this question.
[9] In Bethlehem Mines Corp. v. Department of Environmental Resources, 1983 EHB 296, a case cited by DER, the issue of DER's power to enforce the Law against coal mines was not raised. In any event an EHB determination has no precedential value in this Court.
[10] PMC also questions the timeliness of DER's attempt to shift the burden of proof, since DER made its motion after the hearing before the Board. We do not reach this question, however, because of our ruling that 25 Pa. Code §21.101(d) is inapplicable here.