639 A.2d 1265

CONCERNED RESIDENTS OF the YOUGH, INC., Petitioner,

v.

DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.

COUNTY OF WESTMORELAND, Petitioner,

v.

DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.

Commonwealth Court of Pennsylvania.

Argued Nov. 19, 1993.

Decided March 28, 1994.

672

Robert P. Ging, Jr., for petitioner, Concerned Residents of the Yough, Inc.

Jerry H. Seidler, for petitioner, County of Westmoreland.

Jody Rosenberg, for respondent.

R. Timothy Weston, for intervenor.

Before CRAIG, President Judge, McGINLEY, Judge, and NARICK, Senior Judge.

McGINLEY, Judge.

Concerned Residents of the Yough (CRY) and Westmoreland County (County) appeal from a determination of the Environmental Hearing Board (EHB) holding that section 503 of the Solid Waste Management Act (SWMA), Act of July 7, 1980, P.L. 97, *as amended* 35 P.S. §§ 6018.101–6018.1003, did not bar the Department of Environmental Resources (DER) from issuing a solid waste disposal permit to Mill Service, Inc. (Mill Service) for construction of a residual waste impoundment at its waste storage and treatment facility in Yukon, Pennsylvania (Yukon facility), and that the DER did not abuse its discretion in issuing this permit, or other related permits.[1]

Mill Service is engaged in the business of treatment and storage of residual industrial waste, initially at a disposal facility in Bulger, Pennsylvania (Bulger facility), and since 1964, at the Yukon facility. The wastes, consisting primarily of pickle liquor sludge from the iron and steel industry, are stored in reservoirs known as impoundments. After the enactment of the Federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6992k, and Pennsylvania's subsequent adoption of SWMA, Mill Service qualified as an interim service facility for the storage and treatment of hazardous waste. In 1983, Mill Service applied to DER for a hazardous waste disposal permit under SWMA. However, in 1984, DER determined that wastes had leached from Mill Service's impoundments, particularly Impoundment No. 5, and contaminated groundwater from the Pittsburgh Coal Aquifer and the Redstone Coal Aquifer.[2]

On April 19, 1985, while DER and Mill Service were negotiating a settlement, Mill Service submitted an application to construct and operate a sixth impoundment as a residual waste disposal facility. Effective May 24, 1985, Mill Service and the DER entered into a consent order which recognized

1. In addition to the solid waste disposal permit, the DER issued a water obstruction and encroachment permit, a dam safety permit, and an earth disturbance permit.

2. These two aquifers, together with the Pittsburgh Limestone Aquifer, exist in layers beneath the site of the Yukon impoundments.

Mill Service's violations of certain provisions of the SWMA and the Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1–691.1001, and provided a schedule for abating the contamination. The order stated that the DER had determined that on March 7, 1983, and thereafter, dike seepage from Impoundment No. 5 had discharged into the surface and/or groundwater on at least four occasions resulting in contamination. The order further stated that analysis of the dike wall revealed that waste could migrate, or leach, through the wall, although the system was considered presently stable. Consent Order at 5; R.R. at 292a. The order directed Mill Service to: withdraw its application for a hazardous waste disposal permit for Impoundment No. 5; stop depositing new wastes into Impoundment No. 5 by June 30, 1985; follow an approved closure plan for Impoundment No. 5; post a bond to guarantee proper closure of Impoundment No. 5; operate and maintain a leachate collection and treatment system for thirty years after the closure of Impoundment No. 5; monitor groundwater in the Redstone Coal Aquifer and the Pittsburgh Limestone Aquifer and maintain contaminant concentrations at background levels set forth in an appendix to the order; operate an abatement plan to remediate contamination in the Pittsburgh Coal Aquifer; and contribute $200,000 toward the installation of a public water line for the use of private citizens. The consent order also provided that execution of the order and an order of the same date relating to the Bulger facility placed Mill Service in compliance with Section 503 of SWMA so that DER need not deny issuance of the permits, licenses or permit amendments to which Mill Service was otherwise entitled. Consent Order, May 24, 1985, (Consent Order) at 22–23; Reproduced Record (R.R.) at 309a–310a. Although individual members of the Yukon community raised objections to the consent order the order was not appealed.

On August 6, 1986, after a review of Mill Service's compliance history, DER issued Solid Waste Disposal Permit No. 301071 to Mill Service for the construction and operation of a surface impoundment to be known as Impoundment No. 6.

CRY and the County separately appealed the issuance of this permit to the EHB. They also challenged the issuance of the following permits issued the same date in connection with the solid waste disposal permit: Water Obstructions and Encroachment Permit No. E65–164, Dam Safety Permit No. D65–153, and Earth Disturbance Permit No. (65) 65–84–8–2. The appeals of CRY and the County were consolidated at Docket No. 86–513–MJ on August 31, 1990.

Before the EHB both CRY and the County argued that pursuant to the language of Section 503 of SWMA, the DER was under a mandatory duty to deny the permit for Impoundment No. 6 since hazardous waste leachate from Impoundment No. 5 continued to be discharged into the groundwater without a permit after the execution of the consent order and at the time of the issuance of the permit. The County further alleged that the permit should have been denied because the violations which led to the consent order demonstrated that Mill Service was unable to comply with environmental regulations. CRY additionally raised concerns about air pollution and contended that the issuance of the permit violated Article 1, Section 27 of the Pennsylvania Constitution because the environmental harm to be reasonably expected from the construction and operation of Impoundment No. 6 clearly outweighs any economic benefit. CRY and the County both contend that the amount of the bond and public liability insurance set by DER are grossly inadequate.

On August 6, 1990, Mill Service filed a motion in limine to preclude CRY from offering evidence regarding events which had taken place after the date the permits were issued, to preclude evidence regarding violations which were resolved in the 1985 consent order and to preclude evidence regarding the siting of the Yukon facility. This motion was granted on September 17, 1990.

The EHB conducted a hearing from September 26, 1990, to October 3, 1990. On August 10, 1992, CRY filed a motion to reopen the testimony, seeking an order which would permit them to introduce evidence of ongoing leakage from the Yukon

impoundments after the date the permits were issued. The EHB denied the motion.

■ On February 1, 1993, the EHB issued an adjudication holding that neither Section 503(c) nor 503(d) of SWMA barred DER from issuing the permits to Mill Service. The EHB reasoned that the 1985 consent order between the parties, which directed that compliance with the order was sufficient for issuance of the permits, had been approved by this Court and was not subject to collateral attack. It is from the EHB's February 1, 1993, order that CRY and the County appeal.[3]

CRY and the County now contend that the EHB erred in holding that compliance with Section 503 of SWMA did not preclude DER from issuing the permits to Mill Service. In addition, CRY presents the following issues for our disposition: whether the EHB erred in failing to require DER to condition the permit and require Mill Service to monitor air quality; whether the EHB erred by determining that DER did not abuse its discretion when it approved the liner system used in construction of Impoundment No. 6; whether the EHB erred by refusing to permit CRY to present evidence that the liner leaked after the permit was issued; and whether the EHB erred by determining that the permit was not issued in contravention of the right of quiet enjoyment guaranteed to the citizens of Pennsylvania by Article I, § 27 of the Pennsylvania Constitution.

### § 503 Permit Bar

■ Both CRY and the County contend that the DER was prohibited from issuing permits to Mill Service for construction of Impoundment No. 6 by Sections 503(c) and (d) of SWMA. As appellants other than applicants or holders of licenses from DER, the burden of proof was upon CRY and

3. Our scope of review in an appeal of an adjudication by the EHB is limited to a determination of whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were unsupported by substantial evidence. *Bichler v. Department of Environmental Resources*, 144 Pa.Commonwealth Ct. 55, 600 A.2d 686 (1991).

the County to show, on the record presented before the EHB, that the issuance of the permits was arbitrary or amounted to an abuse of discretion. *See* 25 Pa.Code § 21.101(c)(3), *Marcon, Inc. v. Department of Environmental Resources*, 76 Pa.Commonwealth Ct. 56, 462 A.2d 969, 971 (1983). When the protesting party produces credible evidence, the burden of proof shifts to DER to justify the permit. *Marcon*, 76 Pa.Commonwealth Ct. at 59, 462 A.2d at 971.

Section 503 of SWMA provides, in relevant part:

(c) In carrying out the provisions of this act, the department may deny ... any permit or license if it finds that the applicant, permittee or licensee has failed or continues to fail to comply with any rule or regulation of the department; or any condition of any permit or license issued by the department; or if the applicant, permittee or licensee has shown a lack of ability or intention to comply with any provision of this act ... or any rule or regulation of the department as indicated by past or continuing violations. . . .

(d) Any person or municipality which has engaged in unlawful conduct as defined in this act, or whose partner, associate, officer, parent corporation, subsidiary corporation, contractor, subcontractor, or agent has engaged in such unlawful conduct, shall be denied any permit or license required by this act unless the permit or license application demonstrated *to the satisfaction of the Department* that the unlawful conduct has been corrected. (Emphasis added.)

35 P.S. § 6018.503(c) and (d). Initially, we note a distinction between the two sections. While Section 503(c) provides that a permit *may* be denied under certain circumstances, Section 503(d) provides that a permit *shall* be denied unless the applicant has demonstrated to the satisfaction of the DER that unlawful conduct has been corrected.

Charles Duritsa (Duritsa), Regional Director of the DER for Western Pennsylvania testified at the hearing that he was involved in the review of Mill Service's waste management permit application and that on the date the permit was issued

DER had determined that Mill Service was complying with the consent order. Notes of Testimony, September 26, 1990, (N.T. 9/26/90) at 34, 136. Duritsa stated that before making this determination, DER personnel visited the Yukon facility for testing and observation "hundreds" of times. N.T. 9/26/90 at 133. The DER contends that Mill Service's demonstrated compliance with the consent order provided a proper foundation for the DER to conclude that the unlawful conduct had ceased and the permits should issue.

CRY and the County first argue that because Section 503(c) effectively mandates that DER determine whether the unlawful conduct has been terminated before issuance of a permit, the DER's policy of entering into a consent order, which provides that permits will be issued to applicants who engage in certain contamination abatement procedures is an abuse of discretion when, at the same time, the contamination is continuing. CRY and the County's argument in this regard hinges upon the EHB's undisputed findings that hazardous waste continued to leach from the liner of Impoundment No. 5 when the permit was issued. CRY and the County aver that this ongoing environmental violation was a bar to the issuance of a permit under Section 503(d).[4]

This Court dealt with an applicant's responsibility to demonstrate that all unlawful conduct has stopped in *Fiore v.*

---

**4.** CRY and the County both contend that the leakage from Impoundment No. 5 constitutes a continuous unlawful discharge of hazardous waste into the waters of the Commonwealth. At the hearing CRY contended that the leakage constituted a discharge of hazardous waste without a permit. In its brief as intervenor, Mill Service argues that a leak which results in slow seepage and which has been subjected to abatement procedures does not constitute a release of hazardous waste without a permit as prohibited by Section 610(1) of SWMA, 35 P.S. § 6018.610. Section 610(1) provides:

It shall be unlawful for any person or municipality to:
(1) Dump or deposit, or permit the dumping or depositing, of any solid waste onto the surface of the ground or underground or into the waters of the Commonwealth, by any means, unless a permit for the dumping or such solid wastes has been obtained from the department....

We do not interpret this section to mean that a party to a consent order which agrees to abate ongoing leakage must obtain an additional permit from the Department to dump hazardous waste.

*Department of Environmental Resources,* 98 Pa.Common-
wealth Ct. 35, 510 A.2d 880 (1986). In *Fiore,* an applicant who
had been notified of a violation argued that DER effectively
denied him a permit by analyzing Section 503(d), which man-
dates that a permit will not issue if DER is not satisfied that
the unlawful conduct has been corrected. We stated that
although the strictures of Section 503(d) are mandatory noth-
ing in the act prevents an applicant from demonstrating to
DER that the violation has been corrected.

CRY contends that the EHB acknowledged the pre-
cedent that Section 503(d) requires a mandatory denial where
the DER is not satisfied that the conduct has been corrected,
but that the EHB nonetheless went on to determine that DER
did not abuse its discretion by issuing a permit to Mill Service
on the basis of the consent order. We note that while *Fiore*
recognizes that a denial is mandatory where the applicant does
not demonstrate cessation of the unlawful conduct to the
satisfaction of DER, neither *Fiore* nor SWMA set forth pre-
cisely what is required to satisfy DER. We can only note that
the General Assembly chose to grant DER great discretion,
that if DER was satisfied that Mill Service's entry into and
compliance with the terms of the consent order corrected its
unlawful conduct with respect to the violations at the Yukon
site then DER was not mandated to deny the permit. Fur-
ther, the EHB determined that the consent order between
DER and Mill Service was not subject to collateral attack.
The EHB accepted DER's argument that compliance with a
formally executed, approved and unappealed consent order
does not equate with unlawful conduct.[5] True, as CRY and

5. The County states in its brief that it believes if there was an attempt to
 appeal the consent order, this Court would not have exercised jurisdic-
 tion, because prior to the issuance of a permit, any opinion rendered
 would have been purely advisory. The County cites *Commonwealth v.
 Bucks County,* 8 Pa.Commonwealth Ct. 295, 302 A.2d 897 (1973), a
 case in which we relied upon the opinion of the Court of Common Pleas
 of Bucks County, which determined that an exclusionary challenge to
 the constitutionality of a zoning ordinance (as excluding low and
 moderate income housing) was in essence a request for an advisory
 opinion, because whether any person would attempt to construct this
 type of housing in Bucks County in the future was theoretical. Howev-

the County now argue, compliance with the consent order does not require immediate and total cessation of the unlawful conduct, and under the terms of the consent order Mill Service is not required to alter or repair the liner so as to prevent further discharge. However, the EHB noted that DER was satisfied that Mill Service's compliance with the order satisfied the correction of unlawful conduct requirement of Section 503. Consequently, the EHB found DER did not abuse its discretion: discretion clearly conferred by the wording of Section 503(d), which utilizes the phrase "to the satisfaction" of DER. Undeniably the consent order is practical insofar as it requires that Mill Service address and correct the problems with the Yukon facility; it is also realistic because in not mandating denial of a permit for Impoundment No. 6 the order did not destroy Mill Service's economic viability. Although not perfect, a reasonable balancing of interests is necessary.

■ Additionally, CRY and the County assert that even if DER's reliance on the consent order has merit, DER abused its discretion by issuing the permit on August 6, 1986, because DER knew that Mill Service was not then complying with the consent order. Specifically, they allege that Mill Service had failed to successfully and timely achieve closure of Impoundment No. 5 as set forth in the consent order, and that readings from the monitoring site at Impoundment No. 5 revealed that discharges did not meet the background levels set forth in the Appendix to the consent order.

It is undisputed that Mill Service did not adhere to the time schedule for closure set forth in the Paragraph 5 of the consent order. Paragraph 5 reads as follows:

(a) upon approval by the Department of the closure plan, Mill Service shall implement the plan so that closure is completed within a schedule as approved by the Department. Any closure schedule approved pursuant to the

er, the Pennsylvania Supreme Court has explicitly recognized that a local agency has standing to appeal DER's enforcement orders issued under SWMA, because a municipality has a substantial, immediate and direct interest in the well-being of its citizens. *Susquehanna County v. Department of Environmental Resources*, 500 Pa. 512, 458 A.2d 929 (1983).

paragraph shall become a part of this paragraph as if set forth at length.

(b) Closure of surface impoundment No. 5 shall be completed by October 31, 1987.

Consent Order at 10; R.R. at 297a. It is evident from the wording of Paragraph 5(a) that when the consent order was issued DER contemplated possible revisions and modifications to the scheduling of the closure. Consequently, the fact that this schedule was indeed revised is not evidence that Mill Service was not in compliance with the terms of the Consent Order, although the original date set for closure passed. Lamentably, the pollution cannot be corrected quickly and completely by simply turning a faucet; there is no simple solution.

CRY additionally charges that the EHB found that the consent order requires Mill Service to continue pumping the Pittsburgh Coal Aquifer until each well shows a concentration of chlorides of less that 250 milligrams per liter and a concentration of nitrates of less than 10 milligrams per liter, and that as of August 6, 1986, those levels had not been attained, nor had there been a date set when the levels would be attained. Findings of Fact No. 91–92, Decision of the EHB at 19; R.R. at 120a. CRY incorrectly concludes that this finding provides a basis for determining that Mill Service had not complied with the terms of the consent order at that precise time. But the consent order does not set forth a specific date by which the levels were to be attained. CRY would penalize Mill Service for noncompliance with a condition that is not contained in the consent order.

■ CRY further contends that the DER had notice that Mill Service was in violation of the consent order prior to its issuance of the permit because testing at Mill Service's monitoring wells revealed that the presence of certain chemicals in the Redstone Coal Aquifer exceeded background levels set forth in the appendix to the consent order. We note that, as recognized by the EHB, the consent order does indeed set chemical background parameters for checking and comparing

the results of quarterly well monitoring, however, the consent order also sets forth procedures for additional monitoring when any initial quarterly monitoring reveals that the background levels or thresholds are exceeded. Consent Order at 12–14; R.R. at 299a–301a. As recognized by the EHB, the evidence at the hearing indicated that the monitoring uncovered excess background levels and Mill Service conformed with the procedures set out in the consent order with respect to these exceedences. Order of the EHB at 37; R.R. at 138a. The EHB did not err by finding that DER did not abuse its discretion by granting the permit despite the excess background levels.

 Finally, CRY contends that the DER's practice of allowing permits to issue after a legally enforceable consent order which addresses past violations is, in essence, a "regulation" which has not been properly promulgated. The EHB did not address this issue because it concluded that the consent order was not subject to collateral attack. Decision of the EHB at 36; R.R. at 137a. Again, DER's authority to operate within its discretion when "satisfied" with the conduct of the permittee is specifically set forth in Section 503, and the DER's policy in this case does not expand upon or conflict with the wording of the law. Consequently, we will not invalidate DER's action in this case based upon an allegation that DER acted without regulatory authority.

### Air Quality Monitoring

 CRY raises several additional issues, the first of which is whether the EHB erred by failing to require DER to condition permits issued upon Mill Service's installation of air pollution monitoring devices at the site of the impoundment.[6] CRY contends that evidence at the hearing established that

6. Section 104(7) of SWMA, 35 P.S. § 6018.104(7) provides DER with the authority to place conditions upon the permits it issues. Although Sections 14, 15 and 16 of the permit for Impoundment No. 6 prohibit fugitive emissions at the impoundment and prohibit any exceedence of the ambient air quality standards outside the permittee's property line, the permit does not mandate that Mill Service monitor air quality in any way.

nitrogen oxide "fuming" results from the reaction process used to treat waste at the Yukon facility. CRY introduced the testimony of its president, Diana Steck (Steck), that the air was polluted as a result of Mill Service's activities. CRY now argues that Steck's testimony shifted the burden to Mill Service and the DER to establish that air quality control monitoring was not needed.

Paragraph Z of the consent order acknowledges the existence of "fuming" at the Yukon facility:

> Fugitive emissions are contrary to air pollution control regulation regarding fugitive emissions to the outdoor atmosphere at 25 Pa.Code 123.1(a)(9). The treatment of spent nitric acid mixtures has on occasion caused fuming (generation of nitrogen oxides), evidenced by the reddish brown fumes being emitted during the treatment process. These incidents were investigated by both Mill Service and the Department's Bureau of Air Quality Control. Control techniques including water dilution of the acid mixture were developed by Mill Service and approved by the Department as control measures. The Department has determined that the nitric acid fuming incidents have not caused an exceedence of the federal ambient air quality standards for nitrogen oxides at 40 CFR 50.11. The Department has further determined that pursuant to 25 Pa.Code 123.1(a)(9) the fugitive emissions described above are of minor significance.

Consent Order at 8; R.R. at 295a. The consent order directed Mill Service to continue to utilize control measures, as approved by the Bureau of Air Quality Control, to control fugitive emissions and not allow visible air contaminants to pass beyond the Mill Service property line. Consent Order at 12; R.R. at 299a.

Duritsa testified that, with regard to the air quality control provisions in the consent order, he determined compliance prior to issuance of the permit when he received a statement from Joe Pezze (Pezze), Regional Air Quality Manager, that Mill Service was in compliance as of July 21, 1986. Notes of Testimony, October 3, 1990 (N.T. 10/3/90) at 10–11. Duritsa

stated that Pezze was familiar with the facility, had visited the facility, and his staff had conducted sampling at the facility.[7] *Id.* Based on Duritsa's testimony concerning the method of this sampling, the EHB made the following summary:

> The record shows that staff from DER's Bureau of Air Quality conducted testing at the Yukon facility prior to the issuance of the permit for Impoundment No. 6. (F.F. 107) In response to complaints from Yukon area residents, DER first conducted high volume sampling from October 1984 through December 1984, both upwind and downwind of the Yukon facility. (F.F. 110) The testing showed no violations. (F.F. 110) The Air Quality staff conducted further high volume sampling in 1985, again both upwind and downwind of the Yukon Facility, to check for fugitive emissions (F.F. 108), and placed gas chromatographs on the site in 1985–1986 to conduct readings checking for organic contamination. (F.F. 109).

Decision of the EHB at 38; R.R. at 139a.

DER concluded that Mill Service was complying with the consent order regarding the prevention of fugitive emissions. The EHB determined that although CRY presented the testimony of its president, Diana Steck, that the air in the vicinity of the Yukon facility had an odor and there were many health problems in the area which she believed pollution-related, Steck was not considered competent to testify to the adequacy of DER's monitoring or whether Mill Service's activities were causing or contributing to air quality problems. Decision of the EHB at 41; R.R. 142a.

CRY now alleges Steck's testimony shifted the burden of proof to DER to justify the issuance of the permit. CRY

7. CRY interprets Duritsa's statement that testing is the only way to determine whether Mill Service complies with the sections of the consent order dealing with air pollution control, N.T. 9/26/90 at 82, as evidence that the Department abused its discretion by failing to condition the permit on installation of a constant monitoring system. But there is no evidence that indicates air pollution problems were not adequately detected and controlled through the use of intermittent samplings in response to citizen complaints, as Duritsa testified had been done in the past at the Yukon facility. N.T. 10/3/90 at 13.

contends that the EHB's treatment of Steck's testimony constitutes a new rule of law, that more than credible testimony from an eyewitness is required to shift the burden, that expert testimony is required. We do not agree. The EHB, as a finder of fact, properly determined that Steck was not credible on issues relating to the existence or cause of air quality problems which she attributed to Mill Service's operations. The EHB did not err in this specific regard.

In its brief, CRY also asserts that Mill Service violated Section § 502(d) of SWMA, 35 P.S. § 6018.502(d), when it applied for permits and failed to set forth any method for the prevention of air pollution. Section 502 of SWMA sets forth the general requirements for obtaining permits and licenses under the act. Section 502(d) specifically directs that the application for a permit shall set forth the manner in which the operator plans to comply with the requirements of the Clean Streams Act and the Air Pollution Control Act. This issue is not set forth in CRY's statement of questions and consequently will not be discussed here.

## Liner

CRY makes two arguments concerning alleged leakage from the liner in Impoundment No. 6, both of which hinge upon a contention that the liner was irreparably damaged during its installation. CRY first contends that the EHB erred by failing to find that the DER abused its discretion in approving the liner for Impoundment No. 6. In support of this argument, CRY alleges that the EHB determined that the liner was permeable, and consequently there was a high probability of leakage. The EHB determined that the DER's approval of a permeable liner was not an abuse of discretion because Impoundment No. 6 had other design features to reduce or eliminate contamination due to passage of waste through the permeable liner, including a multiple liner system and a leachate collection system. Decision of the EHB at 45; R.R. at 146a.[8] CRY maintains that the EHB refused to hear

8. CRY contends, in regard to the permeability of the liner, that it is absurd to interpret the Board's regulatory scheme as allowing the liner

evidence that leakage through the liner of Impoundment No. 6 was occurring, not because of permeability, but because it had been torn and abraded during installation. We must agree with the EHB that even if the liner was torn during installation, it is irrelevant to DER's pre-installation approval of the liner. Consequently the EHB did not err on this point.

In addition, CRY contends that the EHB erroneously refused to allow the presentation of testimony concerning the alleged violations of law resulting from the operation of Impoundment No. 6, the leaking liner, and the health effects on the community once the permit was issued. CRY contends that the EHB's refusal to allow this testimony was a denial of a *de novo* hearing before the EHB. CRY's position rests upon a fundamental misunderstanding of the nature of *de novo* review.

It is true that when an appeal is taken from a decision of the DER to the EHB, the EHB is required to conduct a hearing *de novo* and is not limited to a review of the evidence received at the DER's fact-finding hearings: when reviewing a discretionary action by the DER the EHB is permitted to substitute its discretion for that of the DER based upon the record before it. *Warren Sand and Gravel v. Department of Environmental Resources*, 20 Pa.Commonwealth Ct. 186, 203–04, 341 A.2d 556, 565–66 (1975). However, the EHB is still bound by the primary rules of evidence, particularly that evidence must be relevant to the issue. In this case, evidence that the liner to Impoundment No. 6 was damaged during construction or that such damage resulted in leakage and danger to the health of the community was not relevant to whether the DER abused its discretion in issuing a permit for the construction of the impoundment, as this infor-

to leak, and that it should be apparent to this Court that primary liners are not supposed to leak. We disagree. The properties and functions of materials used in solid waste disposal are not apparent to the Court. We assume that what CRY is actually asserting is that it was an abuse of discretion for DER to approve a permeable primary liner, despite the other aspects of this liner's design and collection system engineered to prevent an environmental violation. CRY cites no testimony that supports this assertion.

mation was not available to the DER, the EHB, or anyone at the time that the permit was issued.

### Pennsylvania Constitution

Finally, CRY contends that the EHB erred in ruling that the DER did not violate Article 1, Section 27 of the Pennsylvania Constitution, which provides:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historical and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

In *National Solid Waste Management v. Casey*, 143 Pa.Commonwealth Ct. 577, 600 A.2d 260 (1991), we stated that SWMA, and the regulations promulgated thereto, indicate the General Assembly's clear intent to regulate in plenary fashion every aspect of the disposal of solid waste, consequently, the balancing of environmental concerns mandated by Article 1, Section 27 has been achieved through the legislative process. Duritsa testified that, as a part of the permit review process for Impoundment No. 6, the DER reviewed all the regulations enacted under SWMA dealing with quality of life issues such as the effect of the disposal facility on the environment and the public, and aesthetics and quality of life. N.T. 9/26/90 at 87–88.

CRY contends, however, that the constitutional rights of its members under Article 1, Section 27, were violated when the EHB dismissed its complaints to the generation of noise and the denial of the enjoyment of quiet, serene surroundings. Initially, we note that there is nothing in Article 1, Section 27, which explicitly provides the citizens of Pennsylvania with a right to quiet, serene surroundings. However, CRY also contends that the EHB's decision fails to recognize that the DER's action in approving the permit for the construction of Impoundment No. 6 violated the third prong of the test for

review set forth in this Court's decision in *Payne v. Kassab*, 11 Pa.Commonwealth Ct. 14, 312 A.2d 86 (1973).

In *Payne* a group of citizens sought to enjoin the Department of Transportation from cutting down trees to widen a street in Wilkes–Barre, Pennsylvania. This Court determined that Article 1, Section 27 of the Pennsylvania Constitution was designed to promote controlled development of natural resources, rather than no development, and that judicial review of decisions with environmental impact would entail a threefold standard: (1) was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources; (2) does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum; and (3) does the environmental harm from the challenged decision or action so clearly outweigh the benefits to be derived that .to proceed further would be an abuse of discretion? *Payne*, 11 Pa.Commonwealth Ct. at 29–30, 312 A.2d at 94.

It is this last element of the *Payne* standard which CRY contends was violated by issuance of the permit to Mill Service for construction of Impoundment No. 6. CRY contends that the DER failed to give any meaningful consideration to any factors related to noise, aesthetics or quality of life.[9] Despite Duritsa's testimony that all relevant regulations were considered, CRY accurately notes that Duritsa testified there were no standards promulgated by the Commonwealth for regulation of noise, and the only aesthetic standard against which the facility was measured was whether it met the setback requirement. N.T. 9/26/90 at 86–87.

The EHB determined in its opinion that CRY provided no basis for finding that DER failed to consider quality of life in its review of the permit application, stating

9. We note that the adverse impact on noise and aesthetics created by commercial use of property is not strictly an environmental concern, and this Court has found that zoning laws seeking to preserve the aesthetic character of a locality can be properly applied to solid waste management facilities. *Sunny Farms, Ltd. v. North Codorus Township*, 81 Pa.Commonwealth Ct. 371, 474 A.2d 56 (1984).

that Duritsa's testimony revealed that consideration was given both to noise and aesthetics, as dealt with in SWMA regulations, as well as the potential for leakage of the liner, in the permit review process. Decision of the EHB at 44–46; R.R. at 145a–47a. We agree. In light of the Court's decision in *National Solid Waste Management,* discussed above, DER did not violate Section 1, Article 27, of the Constitution by not conducting an exhaustive review of quality of life issues which are not covered by regulation under SWMA. The EHB did not err when it found that DER sufficiently considered air quality, noise, quality of life and design of the impoundment in review of the permit application.

The decision of the EHB is affirmed.

## *ORDER*

AND NOW, this 28th day of March, 1994, the decision of the Environmental Hearing Board in the above-captioned opinion is hereby affirmed.

BERNARD L. McGINLEY, Judge.

KELLEY, J., did not participate in the decision in this case.