**LEATHERWOOD, INC., Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL PROTECTION; The Commissioners of Jefferson County; The Jefferson County Solid Waste Authority; The Clearfield Jefferson Counties Regional Airport Authority; and Pinecreek Township, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 2003.
Decided March 18, 2003.

James V. Corbelli, Pittsburgh, for petitioner.

Michael D. Buchwach, Pittsburgh, for respondent, Dept. of Environmental Protection.

Robert P. Ging, Jr., Confluence, for respondents.

BEFORE: McGINLEY, Judge, SIMPSON, Judge, KELLEY, Senior Judge.

OPINION BY Judge SIMPSON.

Leatherwood, Inc. (Leatherwood) appeals an order of the Environmental Hearing Board (EHB) revoking the executory solid waste permit (Permit) issued by the Department of Environmental Protection (DEP) to permit construction and operation of a solid municipal waste landfill (Landfill) near DuBois—Jefferson County Airport (Airport). Agreeing that DEP failed to properly resolve a known risk of bird/aircraft collisions, we affirm revocation of the permit.

## I.

The complex procedure of this litigation requires explanation. In May 1995, DEP issued the executory Permit to Leatherwood pursuant to its authority under the Solid Waste Management Act (SWMA).[1] The Jefferson County Commissioners, the Jefferson County Solid Waste Authority, and Clearfield Jefferson Counties Regional Airport Authority (collectively Local Government Officials) responded by filing an appeal of the Permit, the first appeal involving the Permit.

In 1996, Congress enacted the Federal Aviation and Reauthorization Act of 1996 (FARA), regulating, among other things, the placement of landfills near airports. Section 1220(d) of FARA, 49 U.S.C. § 44718(d), prohibited Leatherwood from constructing the Landfill. After the enactment of FARA, DEP issued an order suspending Leatherwood's Permit. Leatherwood appealed DEP's suspension order to the EHB, the second appeal.

Another landfill operator with a landfill near the Airport challenged the constitutionality of Section 1220(d) of FARA. Both appeals were stayed pending that separate but significant litigation. Ultimately, Congress enacted legislation substantially modifying Section 1220(d) of FARA. As a result, DEP revoked its prior suspension order and issued a second suspension order. The new order suspended the Permit indefinitely while DEP decided whether to approve a bird hazard mitigation plan submitted by Leatherwood.

Thereafter, the EHB consolidated the first appeal by Local Government Officials from the issuance of the Permit with the second appeal by Leatherwood from the

---

1. Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.101–6018.1003.

suspension of the Permit. The EHB postponed a hearing on the merits of the appeals pending consideration of a revised bird hazard mitigation plan. In January 2001, although DEP had yet to render a decision on the mitigation plan, the EHB began to conduct hearings on the first appeal.

Administrative Law Judge Michelle A. Coleman presided over 28 days of hearings on the merits and conducted an extensive site view. Thereafter, the EHB issued a thorough and thoughtful opinion setting forth detailed findings summarized below.

## II.

The proposed Landfill consists of approximately 650 acres located in a sparsely populated area in the northeast corner of Pinecreek Township, Jefferson County. The eastern perimeter of the Landfill disposal area would lie approximately 12,600 feet from the western end of the Airport's sole runway, and the entire disposal area would range between 12,500 and 15,500 feet from the western end of the runway. The Landfill would accept waste generated in Armstrong County, Pennsylvania and in the New York City metropolitan area.

Pursuant to federal regulations, owners or operators of new or existing municipal waste landfills within 10,000 feet of any airport runway end that is used by turbo jet aircraft "must demonstrate that the [landfill] units are designed and operated so that the [landfill] unit does not pose a bird hazard to aircraft." 40 C.F.R. § 258.10(a) (1995). "Bird hazard" means "an increase in the likelihood of bird/aircraft collisions that may cause damage to the aircraft or injury to its occupants." 40 C.F.R. § 258.10(d)(2) (1995).

Federal Aviation Administration (FAA) Order 5200.5A provides guidance concerning establishment of waste disposal facilities in the vicinity of airports. Pursuant to FAA Order 5200.5A, a waste disposal facility is considered incompatible with safe flight operations if it is located "within a 5 mile radius of a runway end," and the facility "attracts or sustains hazardous bird movements from feeding, water or roosting areas into or across the runways and/or approach and departure patterns of aircraft."

In 1991, Leatherwood notified the FAA of its intent to construct the Landfill within 12,500 to 15,500 feet of the Airport's runway. In response, the FAA conducted an evaluation of the proposed site and communicated its negative findings to Leatherwood (FAA Review Letter).

Pursuant to SWMA regulations then existing, Leatherwood was required to include an environmental assessment with a detailed analysis of the potential impacts of the proposed facility on the environment and public health and safety. 25 Pa.Code 271.127(a) (1995). DEP, after consultation with appropriate governmental agencies and potentially affected persons, was required to evaluate the environmental assessment to determine whether a threat to the environment or public health and safety was present. 25 Pa.Code § 271.127(b) (1995). If DEP or Leatherwood determined the Landfill could cause harm, Leatherwood was required to provide a written explanation of how it planned to mitigate the harm, through alternatives to the design or siting of the facility or other appropriate measures. 25 Pa.Code § 271.127(c) (1995).

Leatherwood's 1994 application included an environmental assessment, but did not identify the bird hazard as a potential harm. The assessment also failed to provide any analysis of the likelihood of a bird/aircraft collision. In addition, the application did not identify attraction of birds as a potential nuisance, and the nuisance

control plan submitted with the Application did not address birds in any way. Further, the application did not contain any analysis of the Landfill's potential to attract bird movements into or across the approach and departure patterns of aircraft using the Airport. Also, the application did not contain any analysis of the likelihood of birds striking aircraft that use the Airport.

During its review of the Application, DEP personnel determined the potential for bird/aircraft collisions could significantly increase with activity at the proposed Landfill. Consequently, DEP determined the Landfill posed a threat to public safety. DEP based its determination on the negative FAA Review Letter, testimony by officials from the Pennsylvania Department of Transportation (PennDOT) Bureau of Aviation and USAir executives, oral and written correspondence from the FAA and PennDOT Bureau of Aviation.

Regulations in effect at the time placed the burden on the applicant to provide an adequate, site—specific environmental assessment. Prior to issuing the Permit, however, DEP did not require Leatherwood to provide any analysis quantifying the bird hazard. In addition, DEP did not engage an expert on birds and landfill operations to analyze the perceived harm posed by the bird hazard. Further, although DEP identified the bird hazard as a significant threat, it did not require Leatherwood to submit a bird hazard mitigation plan.

In 1994, DEP held a public hearing on the Application. At the hearing, Local Government Officials introduced a letter from an FAA official expressing opposition to the Landfill. Executives from USAir Express, the airline that services the Airport, also testified in opposition to the

Landfill. Moreover, USAir executives warned DEP of the safety consequences of operating the Landfill within close proximity of the runway. An aviation specialist from PennDOT Bureau of Aviation testified that the Bureau strongly objected to construction of the Landfill because of the potential bird hazard.[2]

To obtain a permit, Leatherwood was also required to show the need for the proposed landfill facility "clearly outweighed" the potential harm to the environment or public health and safety posed by the Landfill. 25 Pa.Code § 271.201(a)(3) (1995); see Tri County Indus., Inc. et al. v. Dep't of Envtl. Prot., 818 A.2d 574 (Pa.Cmwlth.2003). After quantifying "need for the facility" into a waste volume, DEP assessed the harm posed by the Landfill operation by listing the factors identified in the environmental assessment of the proposed facility, describing the extent of the Landfill's impact with respect to each factor, and noting the mitigation measures to be taken by Leatherwood. DEP set forth its final conclusions regarding the balancing test in a May 1995 memorandum (with emphasis added):

The weighing process provided for in the Policy and Procedure can now be considered, in which identified need is weighed versus potential harm. Need has been identified as 1,053,285 tons of municipal waste....

Particular attention should be given to the potential harm associated with aircraft birdstrike. *Although the facility is not in a regulatory excluded area, therefore making mitigation possible, efforts must be taken to ensure that potential for birdstrikes will not be increased. The applicant should be required to have a site specific birdstrike mitigation plan, which should require [DEP] ap-*

**2.** The transcript of the public hearing was made part of the record before the EHB.

*proval prior to waste acceptance at the facility.*

In weighing the identified need versus potential harm of the facility, [DEP found] the need outweighs the harm significant to the extent of allowing permit issuance. As detailed above, actual impacts are relatively low, in most cases not resulting in significant environmental disturbance nor requiring significant mitigation.

Reproduced Record (R.R.) at 2182a. DEP personnel, however, were unable to explain how they were capable of weighing harm against the need in the absence of an assessment of the bird hazard.

Thereafter, the Director of the Penn-DOT Bureau of Aviation sent a letter to DEP further clarifying the Bureau's opposition to the Landfill. The letter described the Bureau's experience with attempts to control bird hazards at other airports, and that the efforts were not consistently successful. The letter further stated that mitigation attempts have been unsuccessful throughout the United States. In addition, the letter stated the Bureau considered the Landfill to be hazardous because of its location along the extended centerline of the runway.

Ultimately, DEP issued the executory Permit. Notably, the Permit contained a condition that Leatherwood prepare and submit a bird hazard mitigation plan before accepting waste (Condition 40). Specifically, that condition states:

Bird Hazard to Aircraft:

a. In order to ensure that the landfill does not create a potential hazard to public safety, the landfill operation must prepare and submit to [DEP] a plan detailing how the operator will mitigate the potential bird hazard posed by the landfill to air traffic approaching and leaving the Dubois–Jefferson County Airport.

b. The plan must be approved in writing by the Department prior to accepting waste at the landfill.

c. The written determination by the Department on this plan may be appealed pursuant to Section 4 of the Environmental Hearing Board Act . . .

R.R. at 1755a—1756a.

At the EHB hearing, Local Government Officials and Leatherwood presented expert testimony regarding the risk of bird strikes and bird control techniques. William E. Southern, Ph.D., testified on behalf of Leatherwood (Leatherwood's Expert). In 1995, Leatherwood's Expert first informed PennDOT Bureau of Aviation that bird control techniques could be implemented successfully at the Airport. Significantly, Leatherwood's Expert did not visit the proposed site or conduct a site specific study when he made this determination.

Throughout 1996 and 1997, Leatherwood's Expert performed a study of bird species and populations in the area of a separate, nearby landfill. After his population study he opined that the Landfill operations would not create a significant hazard to aircraft at the Airport, even in the absence of a bird control program. He based this opinion on his knowledge of bird behavior, his prior experience with birds at landfills and airports, and his observations at the separate, nearby landfill.

Thereafter, Leatherwood's Expert prepared a bird control program (Bird Control Plan). Leatherwood submitted the Bird Control Plan to DEP in September 1999 in order to satisfy Condition 40. The Bird Control Plan was subsequently revised and resubmitted twice. The Bird Control Plan involves the use of pistol fired pyrotechnics to scare birds from the Landfill and to discourage birds from feeding at the Landfill.

Charles Schaadt, Ph.D., who is an expert in bird identification and bird behavior, testified on behalf of Local Government Officials (Local Government's Ornithologist). Local Government's Ornithologist's testimony sharply disputed the data in Leatherwood's Expert's bird population study, particularly regarding the number of birds attracted to the separate, nearby landfill. In 2001, Local Government's Ornithologist visited the other landfill for several hours, and counted 200 to 300 birds on its active face. He observed numerous birds perched in the trees surrounding the landfill face. A videotape confirmed a large number of birds on the landfill disposal area, in the trees surrounding the landfill disposal area, and flying overhead.

Local Government Officials also presented the testimony of Major Ronald Merritt, who has substantial experience in preparing bird control programs for airports and landfills (Local Government's Bird Control Expert). Local Government's Bird Control Expert conducted an assessment of the separate, nearby landfill and the surrounding area, reviewed the reports and Bird Control Plan prepared by Leatherwood's Expert, and reviewed Leatherwood's Expert's testimony. Local Government's Bird Control Expert opined the bird population study contained insufficient data to predict the types and quantities of birds likely to be attracted to the Landfill.

DEP hired an outside consultant to review the Bird Control Plan. The consultant supplied DEP with reports concerning the Bird Control Plan on three occasions. However, DEP did not issue a decision on the adequacy of the Bird Control Plan or the sufficiency of Leatherwood's Expert's bird population study.

 Ultimately, the EHB concluded Local Government Officials met their burden of proving that issuance of the Permit violated SWMA and its regulations. Specifically, the EHB determined DEP erred by accepting Leatherwood's environmental assessment, which lacked an appropriate analysis of the bird strike risk; permitting Leatherwood to defer submission of its mitigation plan; and relying on Leatherwood's expert. As a result, the EHB revoked the Permit. Leatherwood appeals to this Court.[3]

## III. A.

 Leatherwood first argues the EHB exceeded the scope of its de novo review by considering evidence which became available after DEP issued the Permit in 1995.[4] We disagree.

3. Our review of an EHB order is limited to determining whether the EHB's findings are supported by substantial evidence and whether constitutional violations or errors of law were committed. *Dep't of Envtl. Prot. v. N. Am. Refractories Co.*, 791 A.2d 461 (Pa. Cmwlth.2002).

4. Initially, we note Leatherwood's argument confuses the terms "standard" and "scope" of review. Our Supreme Court, speaking through Justice (now Chief Justice) Cappy, clarified this distinction, stating:

'Scope of review' and 'standard of review' are often albeit erroneously used interchangeably. The two terms carry distinct meanings and should not be substituted for one another. 'Scope of review' refers to the confines within which a [reviewing tribunal] must conduct its examination. In other words, it refers to the matters (or 'what') the [reviewing tribunal] is permitted to examine. In contrast, 'standard of review' refers to the manner in which (or 'how') that examination is conducted.

*Morrison v. Dep't of Pub. Welfare*, 538 Pa. 122, 131, 646 A.2d 565, 569 (1994).

When an appeal is taken from DEP to the EHB, the EHB is required to conduct a hearing *de novo. Warren Sand & Gravel Co., Inc. v. Dep't of Envtl. Res.,* 20 Pa.Cmwlth. 186, 341 A.2d 556 (1975). The EHB is not an appellate body with a limited scope of review attempting to determine if DEP's action can be supported by the evidence received at DEP's fact finding hearing. *Id.* Rather, the EHB's duty is to determine if DEP's action can be sustained or supported by the evidence taken by the EHB. *Dep't of Envtl. Prot. v. N. Am. Refractories Co.,* 791 A.2d 461 (Pa.Cmwlth.2002) (EHB adjudicates matters in the first instance; it does not function as an appellate body).

Leatherwood argues that our decision in *Concerned Residents of the Yough (CRY), Inc. v. Dep't of Envtl. Res.,* 162 Pa.Cmwlth. 669, 639 A.2d 1265 (1994), altered the scope of the EHB's *de novo* review. In *CRY,* a developer applied to DER for a permit to construct a municipal waste impoundment. The application process required the developer to obtain DER approval of an impoundment liner before installation. Ultimately, DER issued the permit and, on appeal, the EHB affirmed. Objectors appealed to this Court, arguing the EHB denied their right to a *de novo* hearing by excluding evidence that the impoundment liner was damaged during installation. We disagreed, stating:

> It is true that when an appeal is taken from a decision of the DER to the EHB, the EHB is required to conduct a hearing *de novo* and is not limited to a review of the evidence received at the DER's fact-finding hearings ... *However, the EHB is still bound by the primary rules of evidence, particularly that evidence must be relevant to the issue.* In this case, evidence that the liner ... was damaged during construction or that such damage resulted in

leakage and danger to the health of the community was not relevant to whether the DER abused its discretion in issuing a permit for the construction of the impoundment, as this information was not available to the DER, the EHB, or anyone at the time that the permit was issued.

*CRY,* 639 A.2d at 1274 (emphasis added) (citations omitted).

Contrary to Leatherwood's argument, *CRY* did not alter the scope of the EHB's *de novo* review. *CRY* reaffirmed that when an appeal is taken from a decision of DEP, the EHB must conduct a hearing *de novo. CRY.* We merely stated that *de novo* review does not require the EHB to consider evidence that is not relevant to the issue being decided. In *CRY* we held that whether an approved liner is subsequently damaged does not necessarily shed light on whether the liner *as specified* was appropriately approved.

Further, the EHB determines from the evidence it receives whether DEP's action can be sustained. Where the EHB finds DEP abused its discretion, it may substitute its discretion for that of DEP and order the relief requested. *Pequea Township v. Herr,* 716 A.2d 678 (Pa.Cmwlth.1998) (holding the EHB may substitute its discretion for that of DEP, and modify DEP's action based on the evidence before the EHB); *Warren Sand & Gravel* (affirming the EHB's modification of permit conditions imposed by DER based on evidence submitted to the EHB).

Here, information relating to the bird hazard generated any time before action on Leatherwood's Bird Control Plan was relevant to the Plan's efficacy. Because the evidence was relevant, the EHB did not exceed the scope of its *de novo* review by considering evidence which became available after DEP issued the executory

Permit, but before approval of the Bird Control Plan.

**B.**

■ Leatherwood also argues Local Government Officials did not carry their burden of proof before the EHB. Specifically, Leatherwood contends Local Government Officials did not present substantial or competent evidence that DEP erred. We disagree.

■ In EHB proceedings, the burden of proof is placed upon the party asserting the affirmative of any issue. *See* 25 Pa. Code § 1021.101. The party protesting issuance of a permit must come forward with evidence to show, on the record produced before the EHB, that issuance of the permit was arbitrary or amounted to an abuse of discretion. *CRY.*

■ "Questions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are properly within the exclusive discretion of [EHB,] the fact finding agency, and are not usually matters for a reviewing court." *Birdsboro and Birdsboro Mun. Auth. v. Dep't of Envtl. Prot.*, 795 A.2d 444, 447–48 (Pa. Cmwlth.2002). Thus, this Court will examine, but not weigh evidence because the EHB, as fact finder, is in better position to find facts based upon testimony and demeanor of witnesses. *T.C. Inman, Inc. v. Dep't of Envtl. Res.*, 147 Pa.Cmwlth. 618, 608 A.2d 1112 (1992). In addition, we may not substitute our judgment for that of the EHB. *Id.*

Here, the EHB accepted the expert evidence presented by Local Government Officials as more credible and persuasive than that presented by Leatherwood. More specifically, the EHB found the testimony of Local Government's Ornithologist credible. The EHB determined that his observations at the separate, nearby landfill, corroborated with a videotape, directly undermined Leatherwood's Expert's bird population study. The EHB was also persuaded by Local Government's Bird Control Expert's credible assessment of the risk of bird/aircraft collisions posed by the Landfill.

Conversely, the EHB rejected the testimony of Leatherwood's Expert. The EHB found Leatherwood's Expert's testimony was insufficient because he omitted numerous factors in his analysis. Specifically, Leatherwood's Expert did not adequately evaluate the number of bird movements into critical air space, which the EHB considered the most important factor.

We will not reevaluate the EHB's credibility determinations or reweigh this evidence. *Birdsboro.* As a result, neither error nor abuse of discretion is evident in the determination that Local Government Officials presented substantial evidence to sustain their burden of proof.[5]

**IV. A.**

■ Leatherwood contends the EHB erred by concluding DEP failed to properly address the risk of bird strikes. In

**5.** Leatherwood relies on *O'Reilly v. Dep't of Envtl. Prot.*, 2001 EHB 19 (2001). There, O'Reilly appealed DEP's issuance of a stormwater discharge permit, asserting that development of the proposed site would harm a nearby stream. The EHB upheld issuance of the permit on appeal, concluding that O'Reilly failed to carry his burden of proving the site's discharge would cause harm. Significantly, the EHB found O'Reilly did not present any credible expert evidence that issuance of the permit would result in harm.

Unlike in *O'Reilly*, however, the EHB found Local Government Officials presented substantial, credible expert evidence to carry their burden of proving DEP erred in issuing the Permit.

support, Leatherwood raises several arguments. Leatherwood first asserts the EHB ignored a controlling regulation which prohibits construction or operation of a landfill within 10,000 feet of an airport runway. 25 Pa.Code § 273.202.[6] Leatherwood asserts that, because the proposed Landfill is not within the total prohibition distance, the EHB erred by revoking the Permit.

Section 273.202 prohibits placement of a landfill within 10,000 feet of an airport runway. The Landfill's location beyond the 10,000 feet total prohibition distance, however, does not raise an entitlement to a permit. Rather, the Landfill's location beyond the 10,000 feet total prohibition distance enables it to try to formulate a plan to minimize safety hazards. *See* FAA Order 5200 .5A (a waste disposal facility within a five mile radius of a runway end that attracts or sustains hazardous bird movements is incompatible with safe flight operations).

 SWMA's implementing regulations require an applicant for a solid waste permit to undertake an environmental assessment. 25 Pa.Code § 271.127(a). Section 271.127(a) sets forth the requisite detailed analysis:

> *Every environmental assessment in a permit application shall include at a minimum a detailed analysis of the potential impact of the proposed facility on* the environment, *public health and safety,* including traffic, aesthetics, air quality, water quality, stream flow, fish and wildlife, plants, aquatic habitat, threatened or endangered species, water uses and land use.

25 Pa.Code § 271.127(a) (emphasis added). Next, DEP must evaluate the applicant's assessment and undertake its own analysis. Specifically,

> [DEP], after consultation with appropriate governmental agencies and potentially affected persons, will evaluate the assessment provided under subsection (a) to determine whether the proposed operation has the potential to cause environmental harm. In determining whether the proposed operation has the potential to cause environmental harm, [DEP] will consider its experience with a variety of factors, including ... similar designs and materials employed at comparable facilities ... If [DEP] determines that the proposed operation has this potential, it shall notify the applicant in writing.

25 Pa.Code § 271.127(b) (1995). The applicant is required to formulate and submit a written mitigation plan for each harm identified. The adequacy of the mitigation plan must then be evaluated by DEP:

> If [DEP] or the applicant determines the proposed operation may cause environmental harm, the applicant shall provide DEP with a written explanation of how it plans to mitigate the potential harm, through alternatives to the proposed facility or portions thereof, including alternative locations, traffic routes or

---

6. That regulation prohibits a municipal waste landfill from being operated:
> (9) Within 10,000 feet—or 3,048 meters—of an airport runway that is or will be used by turbine-powered aircraft during the life of disposal operations under the permit.
> (10) Within 5,000 feet—or 1,524 meters—of an airport runway that is or will be used by piston-type aircraft during the life of disposal operations under the permit.

> (11) Within the conical area at 14 CFR Part 77 (relating to objects affecting navigable airspace) for runway flight paths that are or will be used by turbine-powered or piston-type aircraft during the life of disposal operations under the permit.

25 Pa.Code § 273.202.

designs or other appropriate mitigation measures.

25 Pa.Code § 271.127(c) (1995).

Consequently, Leatherwood's environmental assessment should identify all potential harms to the environment and to public health and safety. Leatherwood's environmental assessment, however, did not identify the bird hazard as a potential harm. Despite this omission, DEP did not require Leatherwood to provide an analysis of the bird hazard. Given the foregoing, we discern no error in the conclusion that DEP failed to enforce the regulations requiring an environmental and safety assessment.

### B.

Leatherwood also argues the EHB's findings, regarding the significant threat to public safety posed by the bird hazard do not accurately characterize the evidence. Here, the EHB found:

121. Bird strikes are a significant problem for airports and aviation. Bird/aircraft collisions can cause, and have caused, serious damage to aircraft, loss of aircraft, and loss of life in aviation accidents.

122. Most bird strikes occur during the descent and landing phases of flight, followed by the take-off and climb-out phases. Aircraft activity in these phases of flight generally occurs at elevations of 1,000 feet or below, and most bird flight activity occurs at similar elevations. The FAA is consequently concerned about bird movements into or across a runway or the approach and departure patterns of aircraft using that runway, and with land uses that cause such bird movements.

123. Landfills attract birds such as gulls, vultures, crows and blackbirds, primarily because of the ready availability of food at a landfill. Landfills provide a consistent food source for birds, and birds develop a habit of returning to a location where they have found a consistent food supply.

124. Birds are attracted to landfills also because the facility provides open spaces for them to loaf relatively undisturbed by predators and human activity, and because the digging operations usually create puddles of water the birds can use for drinking.

EHB's Adjudication at 33–34.

The EHB cited specific evidence in support of each of its findings. Particularly, it noted that the testimony of Local Government's Bird Control Expert and the FAA report entitled *Wildlife Strikes to Aircraft in the United States 1990–1999*, directly support these findings. Because these findings are supported by substantial evidence, we will not disturb them.

### C.

Leatherwood also contends that DEP's insertion of Condition 40 into the Permit, which deferred submission of a bird mitigation plan until any time prior to accepting waste, was adequate to alleviate the risk.

A debate over the timing of the Bird Control Plan is pointless. The EHB concluded that the 1999 Bird Control Plan, even after revision, is unreliable. Whether or not the Plan should have been submitted with the 1994 application, the Plan is ultimately an unacceptable response to the known bird hazard. Thus, the existence of a deferred approval process does not change the result, and this issue does not support reversal.[7]

7. Leatherwood also argues the EHB's deci- sion is inconsistent with the EHB's prior deci-

## V.

Because the foregoing discussion disposes of this appeal, we need not address arguments concerning the Municipal Waste Planning, Recycling and Waste Reduction Act (Act 101). Act of July 28, 1988, P.L. 556 *as amended,* 53 P.S. §§ 4000.101 4000.1904.[8]

 Accordingly we affirm.[9]

## ORDER

AND NOW, this 18th day of March, 2003, the order of the Environmental Hearing Board is affirmed.

sion in *Pa. Envtl. Mgmt. Serv., Inc. (PEMS) v. Dep't Envtl. Res.,* 1981 EHB 395 (1981). PEMS applied for a solid waste permit to construct a landfill less than a mile from an airport. DER denied the application based on its belief that the landfill would create a hazard by attracting birds. DER relied almost exclusively on a letter from PennDOT in opposition to the landfill. On appeal, the EHB reversed, holding that PEMS established through credible expert testimony that the bird hazard could be controlled.

*PEMS* is inapposite for several reasons. First, in *PEMS* the EHB analyzed the potential bird hazard using the public nuisance doctrine, rather than the regulations attendant to SWMA, which were not yet in effect. Also, unlike PEMS, Leatherwood failed to develop an adequate Bird Control Plan to show it could control the hazard. And, unlike the objectors in *PEMS,* Local Government Officials presented substantial evidence on the risk of bird strikes and the defectiveness of Leatherwood's mitigation plan.

8. The EHB noted "many of the Act 101 related regulations at issue in this appeal have now been repealed or significantly amended, (thus rendering discussion of these regulations somewhat academic)...." EHB Adjudication at 66.

9. Leatherwood also contends the EHB erred by relying on hearsay evidence introduced for

a limited purpose, but not for its substance, as the basis for its decision. We disagree. Leatherwood's assertion is unsupported. Moreover, this assertion is unaccompanied by an offer to prove prejudice. *See Dep't of Gen. Serv. v. United States Mineral Prod. Co.,* 809 A.2d 994 (Pa.Cmwlth.2002) (to constitute reversible error, evidentiary ruling must not only be erroneous, but also prejudicial to the complaining party).

Leatherwood further asserts the EHB erred by ruling on its bird control plan because DEP had yet to issue its final decision on the plan. This argument lacks merit. In conducting *de novo* review, the EHB considers the case anew. Also, the EHB's duty is to determine if DEP's actions can be supported by the evidence taken by the EHB. *Pequea Township.* Moreover, Leatherwood fails to explain how it was prejudiced by EHB's consideration of the plan. Thus, we discern no error from the EHB's decision to adjudge the efficacy of the bird control plan.

Also, as a final issue, Leatherwood asserts the EHB erred by revoking the residual waste provisions of the Permit without make findings on this issue. However, Leatherwood failed to raise this issue before the EHB, and has waived it. *McDonald Land & Mining Co. v. Dep't of Envtl. Res.,* 664 A.2d 194 (Pa. Cmwlth.1995) (issue which is not raised before EHB is waived for purposes of appellate review).