**DELAWARE RIVERKEEPER, Delaware Riverkeeper Network, and the American Littoral Society, Petitioners**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 9, 2005.

Decided July 12, 2005.

Carole Hendrick, Washington Crossing, for petitioners.

Michael T. Ferrence, Wilkes–Barre, for respondent.

R. Timothy Weston, Harrisburg, for intervenor, Borough of Portland.

BEFORE: COLINS, President Judge, LEADBETTER, Judge (P), and KELLEY, Senior Judge.

OPINION BY Judge LEADBETTER.

The Delaware Riverkeeper, the Delaware Riverkeeper Network and the American Littoral Society [1] petition for review of the order of the Environmental Hearing Board (EHB), which denied their appeal from two decisions of the Department of Environmental Protection (DEP). DEP approved the Borough of Portland's Sewage Facilities Plan (often referred to as an Act 537 Plan) pursuant to the Pennsylvania Sewage Facilities Act, Act of January 24, 1966, P.L. (1965) 1535, as amended, 35 P.S. §§ 750.1–750.20a (often referred to as Act 537).[2] DEP also issued a NPDES permit,[3] pursuant to the Clean Streams Law, Act of June 22, 1937, P.L.1987, as amended, P.S. §§ 691.1–691.1001,[4] for the

1. Maya Van Rossum is currently the Delaware Riverkeeper, overseeing the operation of the Delaware Riverkeeper Network, which is a non-profit organization affiliated with the American Littoral Society, a non-profit New Jersey corporation that advocates the environmental protection of the River, its tributaries and its coastal zone.

2. Under the Sewage Facilities Act, each municipality must submit to DEP an officially adopted plan for sewage services, commonly referred to as an "Act 537 Plan." In general, the plan must describe existing sewage disposal methods, take into consideration existing plans for population growth and land development, provide for future needs by specifying plans for sewage treatment facilities that will adequately prevent the discharge of untreated or inadequately treated sewage or other waste into any waters. See Section 5 of the Act, 35 P.S. § 750.5.

3. "NPDES" is an acronym for National Pollutant Discharge Elimination System, a system of federal regulatory controls, pursuant to the Federal Water Pollution Control Act (also known as the federal Clean Water Act), 33 U.S.C. §§ 1251–1376, governing the discharge of pollutants into waters of the United States. A NPDES permit may be issued by the Administrator of the federal Environmental Protection Agency or, since the 1972 amendments to the federal Clean Water Act, may be issued by DEP pursuant to the regulations at 25 Pa.Code §§ 92.1–92.94.

4. Section 202 of the Pennsylvania Clean Streams Law, 35 P.S. § 691.202 provides that:

No municipality or person shall discharge or permit the discharge of sewage in any manner, directly or indirectly, into the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department [DEP] or such

discharge of treated wastewater from the sewage facility into the Delaware River. The Riverkeeper contends that, insofar as the Borough sought approval for a sewage treatment plant with a design capacity in excess of the Borough's present needs and intended to serve a portion of the neighboring township in the future, DEP erred in approving the plan without requiring that Upper Mount Bethel Township update its Act 537 Plan. We conclude that DEP properly approved the Plan and issued the NPDES permit. Therefore, we affirm.

The Borough of Portland, a small municipality with a population of approximately 579 residents, is located in the northeastern portion of Northampton County approximately five miles from the Delaware Water Gap and thirty miles northeast of the Allentown/Bethlehem/Easton area. The Delaware River forms the eastern boundary and Upper Mount Bethel Township surrounds the Borough on all other sides. As early as 1966, the Borough had identified, in its comprehensive plan for land development, its need for a municipal sewer system to replace problematic individual on-lot systems. In the late 1990's, the Borough identified land within the Portland Industrial Park as a potential site for a sewage treatment plant and it appeared that county grant funds might become available. In 2002, the Borough hired Brinjac Engineering to study the feasibility and cost analysis for constructing a treatment plant initially intended solely for the needs of the Portland Industrial Park but later expanded to address the Borough's sewage disposal needs. In light of the fact that approximately 50% of the nearly 100–acre Portland Industrial

Park is located in Upper Mount Bethel Township and that the Township was initiating the process for revising its Act 537 Plan, the Borough inquired as to the Township's interest in joint planning for the reservation of some treatment capacity. The Chairman of the Township's Board of Supervisors responded in March 2002, by letter stating, in pertinent part, that after consultation with its engineers, the Township would like a reservation of approximately 100,000 gallons per day (gpd) capacity but the Township could not complete its Act 537 planning until it secured funding to pay planning costs that exceeded budget restraints. By August 2002, the Borough adopted a resolution approving its Act 537 Plan prepared by Brinjac Engineering as its official plan and submitted the Plan to DEP for approval.

The Borough's Plan, approved by DEP in March of 2003, provides for construction of a treatment plant with an ultimate capacity for 294,000 gpd and an initial design flow of 105,000 gpd. The Plan allocates sewage treatment capacity of 65,332 gpd for the Borough's current needs, 35,000 gpd for the current and future needs of the Industrial Park and 4,688 gpd for the Borough's growth. The Plan anticipates the later addition of 100,000 gpd for the Township. The Borough's collection system consists of approximately 18,000 linear feet of gravity sewers and mains, 4,000 feet of low-pressure sewers and force main, and a pump station with the capacity of 200,000 gpd. The outfall discharge line (pipes that transmit treated effluent from plant to river), which has a flow capacity of 205,000 gpd, crosses an alluvial floodplain wetland area within 200 to 300 feet of the River and it traverses a portion of the

person or municipality has first obtained a permit from the department.... A discharge of sewage without a permit or contrary to the terms and conditions of a per-

mit or contrary to the rules and regulations of the department is hereby declared to be a nuisance.

Township. Impact on the wetlands, which will occur during construction, will be temporary and subject to pre-construction approval by DEP and the County Conservation District.

As a condition of Plan approval, DEP required that the Borough obtain a NPDES Permit for effluent discharge into the Delaware, which is designated by DEP as a "warm water fishery/migratory fishery."[5] DEP also required that the Borough obtain a Water Quality Management Part II Permit for the construction and operation of the treatment plant pursuant to Section 207 of the Clean Streams Law, *as amended,* 35 P.S. § 691.207. In July of 2003, DEP issued the NPDES Permit limiting discharge to treated domestic sewage, permitting no industrial waste, and specifying effluent limitations for factors such as minimum dissolved oxygen, maximum biochemical oxygen demand ($CBOD_5$), residual chlorine, fecal coliform concentrations and suspended solids. The Permit reserved to DEP the right to modify the permit specifications to impose more stringent effluent standards that, in the future, DEP or the Delaware River Basin Commission may adopt.

The Riverkeeper timely appealed to the Environmental Hearing Board from DEP's approval of the Act 537 Plan and filed a second timely appeal from the issuance of the NPDES Permit. The EHB consolidated the appeals and scheduled a de novo hearing. *See Leatherwood, Inc. v. Dep't of Envtl. Prot.,* 819 A.2d 604, 611 (Pa.Cmwlth.2003) (stating that when an appeal is taken, EHB must conduct a de novo hearing). Before the EHB, the Riverkeeper contended that, because the Borough's Plan contemplates future service for the Township, DEP erred in approving the Plan without concurrent submission of

a Township Act 537 Plan or submission of a joint Plan. The Riverkeeper further contended that the Act 537 Plan failed to adequately consider and choose the best alternative. In challenging the issuance of the NPDES Permit, the Riverkeeper asserted, in summary, that DEP lacked sufficient evidence of the likely adverse impacts on the River, improperly weighed the risks and benefits, permitted a daily discharge flow that exceeded the Borough's actual needs and permitted certain effluent pollutants to exceed the limitations identified in the Plan.

Following a seven-day hearing, at which both sides in the dispute introduced extensive expert testimony, documentation and a stipulation as to 252 enumerated facts, the EHB issued a lengthy adjudication, stating in its synopsis:

> The Board dismisses appeals by public interest groups challenging the Department's approval of a revision to a Borough's sewage facilities plan for a central sewage treatment plant and collection system within the Borough and the issuance of a related NPDES Permit. Although the plan revision contemplated possible further development of the sewage treatment plant to accommodate flows from a neighboring township, that option was not approved by the Department. The Department's approval of the central treatment system as the alternative selected by the Borough for its sewage needs did not require simultaneous or joint sewage plan revisions by both municipalities. The appellants failed to prove that the Department improperly accepted the Borough's assessment of sewage needs and decision to completely sewer the Borough rather than

5. This designation of protected water uses, assigned under 25 Pa.Code § 93.9c, estab-lishes the applicable water quality standards under 25 Pa.Code § 93.7.

continue to rely on on-lot sewage facilities as a method of sewage disposal or that the consideration of alternative means of sewage disposal was inadequate.[6] The appellants also did not prove that the proposed sewage facilities or the discharge of treated effluent into the Delaware River will measurably degrade the water quality in the Delaware River, cause significant harm to wetlands or adversely affect threatened or endangered species. However, the Board does find that the appellants adduced sufficient evidence of their interest in the outcome of the litigation to demonstrate their standing to appeal.

*Delaware Riverkeeper v. Dep't of Envtl. Prot.* (EHB No.2003–083–MG, issued August 12, 2004), Adjudication at 1–2 (footnote added). Following the EHB's decision, the Riverkeeper filed the present appeal, contending that DEP erred in approving the Borough's Plan without first requiring either the submission of an Act 537 Plan from the Township or a joint municipal Plan. The Riverkeeper argues that submission of a Township Plan is essential because the Borough's Plan establishes the facility location and type of sewage treatment for the Township's future use and, pursuant to the doctrine of administrative finality, preordains these elements of the Township's Act 537 Plan without the requisite DEP review of the Township's needs and alternatives. Finally, the Riverkeeper challenges the issuance of the NPDES Permit as a byproduct of the improper Act 537 Plan approval.

■ The Sewage Facilities Act requires that each municipality in the Commonwealth submit to DEP an officially adopted plan for sewage services for areas within its jurisdiction and revise the plan periodically as required under the applicable regulations. 35 P.S. § 750.5(a). The Act permits two or more municipalities to submit a joint plan or any revisions thereto, 35 P.S. § 750.5(c); and, announces a policy favoring intermunicipal cooperation in the implementation and administration of plans, 35 P.S. § 750.3(2) and (3).[7] However, the Act does not require the submission of a joint plan or revisions even where two or more municipalities share a sewage treatment facility. Pursuant to the regulations promulgated under the Act, DEP "may require two or more municipalities to develop and submit jointly a single official plan." 25 Pa.Code § 17.13(c). However, DEP is not obligated to demand a joint plan.

■ Similarly, the Clean Streams Law, in order to prevent and eliminate pollution in Commonwealth waters, directs that, when taking any action pursuant to the Law DEP, in the exercise if its sound

---

6. In the appeal before the EHB, the appellants bore the burden of proof pursuant to EHB practices and procedure as set forth in 25 Pa.Code §§ 1021.1–1021.201. Specifically, 25 Pa.Code § 1021.122 directs, in pertinent part: "(c) A party appealing an action of the Department shall have the burden of proof in the following cases: ... (2) When a party who is not the recipient of an action by the Department protests the action."

7. Regarding intermunicipal cooperation and planning, the Sewage Facilities Act provides in subsection 5(c): "The required plan or any revision thereof may be submitted jointly by two or more municipalities." 35 P.S. § 750.5(c). Further, the statement of policy at section 3, in relevant part, announces a policy "[t]o promote intermunicipal cooperation in the implementation and administration of such plans by local government," and "[t]o prevent and eliminate pollution of waters of the Commonwealth by coordinating planning for the sanitary disposal of sewage wastes with a comprehensive program of water quality management." 35 P.S. § 750.3(2) and (3).

discretion, consider, where applicable, "water quality management and pollution control in the watershed as a whole." 35 P.S. §§ 691.4 (declaration of policy) and 691.5(a)(1) (powers and duties). The Law affords DEP fairly broad power to order that a municipality correct or mitigate inadequacy in its sewage treatment facilities. 35 P.S. § 691.203. Section 203 of the Law, in pertinent part, states:

> Such orders may include, but shall not be limited to, orders requiring municipalities to undertake studies, to prepare and submit plans, to acquire, construct, repair, alter, complete, extend, or operate a sewer system or treatment facility, or to negotiate with other municipalities for combined or joint sewer systems or treatment facilities.

35 P.S. § 691.203(b). However, no provision of the Law imposes a requirement that DEP demand a plan from a neighboring municipality prior to issuing its approval of a submitted Plan that alleviates an already identified problem in the applicant municipality.

The regulations further direct that, "in approving or disapproving an official plan or official plan revision, the Department will consider . . . (7) If the [plan] includes proposed sewage facilities connected to or otherwise affecting sewage facilities of other municipalities, whether the other municipalities have submitted necessary revisions to their plans for approval by the Department." 25 Pa.Code § 71.32(d)(7). As for when revisions are deemed necessary, the regulations direct, in pertinent part, that:

> (a) A municipality shall revise its official plan when:
>
> (1) A new subdivision is proposed, except as provided by § 71.55 (relating to exceptions to the requirement to revise the official plan for new land development) or subsection (b).

(2) The official plan, or its parts, is inadequate to meet the sewage needs of the new land development.

(3) Newly discovered or changed facts, conditions or circumstances make the plan inadequate to meet the sewage needs of new land developments.

(4) A permit is required from the Department under section 5 of the Clean Streams Law (35 P.S. § 691.5) [which generally directs that in issuing orders or permits DEP "shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act (to prevent and alleviate water pollution), consider, where applicable, the following: . . . (3) The feasibility of combined or joint treatment facilities"].

25 Pa Code § 71.51(a). Nothing in the record establishes that the Township, either by subdivision review, by a determination of inadequacy or by an application for a permit, triggered an obligation under this regulation to revise its Act 537 Plan.

While the design of the sewage facility in the Borough certainly anticipates the Township's eventual shared use, DEP's approval presently authorizes only the construction of a collection system and treatment facility for the Borough's needs. DEP did not approve any connection to sewage facilities in the Township and the Borough's system will not otherwise affect the Township's existing sewage facilities. This fact distinguishes the present case from *Montgomery Township v. Department of Environmental Resources*, 1995 EHB 483, where the township's sewage was already being treated at the borough plant when the borough submitted a revised Act 537 Plan proposing to replace its outdated treatment plant with a new spray irrigation facility. In *Montgomery Township*, the EHB held that the Department could not approve the borough's Plan un-

less the township affected by that Plan also revised its 537 Plan accordingly. In the present case, the Township's reservation of sewage treatment capacity without any actual commitment to connect to the Borough's plant does not trigger a requirement for joint or concurrent planning.

 The doctrine of administrative finality, which amounts to the application of collateral estoppel principles to agency decisions, does not work, as the Riverkeeper contends, to pre-establish elements of the Township's eventual 537 Plan revision or make it inevitable that the Township must connect to the Borough's plant. As DEP asserts in its brief, the scope of what it approves defines what becomes final absent appeal. *See Lehigh Township v. Dep't of Envtl. Prot.*, 1995 EHB 1098. Inasmuch as DEP has not approved revisions to the Township's Act 537 Plan and any connection to the Borough's plant requires such approval, the doctrine of administrative finality will not bar a challenge to any future Plan by the Township.

The EHB acknowledged that "joint planning by the Township and the Borough may have been desirable" and noted that "it is possible that the existence of the Borough's treatment system may influence the evaluation of alternatives available to the Township in devising any revision it may make to its Act 537 Plan." However, the EHB further noted that in proposing a modular treatment system rather than seeking at the outset to build capacity for the Township, the Borough did not commit itself to a plant that is economically dependent upon the Township's use. The EHB found that the Borough's Plan corrected existing local deficiencies in sewage disposal in a manner sufficiently designed to mitigate environmental concerns and correctly concluded that the law does not require that approval of the Borough's Plan await Township Plan approval merely due to the fact that the Borough had anticipated possible sewage treatment needs beyond its borders. In its findings and conclusions, EHB neither misapplied the law nor abused its discretion.

Accordingly, we affirm.

Judge LEAVITT did not participate in the decision in this case.

### O R D E R

AND NOW, this 12th day of July, 2005, the order of the Environmental Hearing Board in the above captioned matter is hereby AFFIRMED.